[No. 22897. Department Two. April 22, 1931.]

ETHEL UNDERWOOD, *Appellant,* v. OTHA UNDERWOOD, *Respondent.*[1]

*McAulay & Freece,* for appellant.
*Grady & Velikanje,* for respondent.

BEELER, J.—The parties to this divorce action were married in August, 1917, at Yakima, Washington, each being then about twenty-one years of age. Prior to the time of the marriage, the plaintiff had been employed as a waitress and the defendant as a common laborer, which occupation he followed for several years, earning from $3.50 to $4 per day. During the year 1925 or 1926, he purchased and began to operate a truck, and later acquired two additional trucks. By

[1]Reported in 298 Pac. 318.

thrift and frugality, the parties accumulated community property valued at from $10,000 to $12,000. One child was born as issue of the marriage, a boy, now twelve years of age.

Plaintiff based her complaint for divorce on cruelty and drunkenness. She prayed for one-half of the community property, for a reasonable monthly allowance for her support and maintenance and for that of the minor child, and for the custody of the child. The defendant in his answer admitted the allegations of the complaint as to the character and value of the community property, but denied the allegations of cruelty and drunkenness, and by way of cross-complaint charged his wife of being irritable, quarrelsome, fault-finding, and creating such havoc in the home as to render it impossible and incompatible for them to continue to live together as husband and wife with any degree of peace or comfort.

The cause was tried on these issues, and resulted in findings to the effect that the defendant had been guilty of cruelty, especially on those occasions while under the influence of intoxicating liquor, and that the defendant, at times, had used intoxicating liquor to excess. The court further found that plaintiff was gifted with a sharp tongue and that the parties engaged in frequent quarrels and bickerings.

The court awarded the residence property, together with the household furniture and $1,188.32 in cash, to the plaintiff. Three Graham trucks, three hoists, a Dodge automobile, the Blanchard real estate contract on which there was a balance due of approximately $1,120, a note of $300, and $1,118.56 in cash, was awarded to the defendant, out of which he was required to pay $582.35 for attorneys' fees and court costs. The custody of the child was awarded to the

plaintiff, with visitation privileges to the defendant to have the child

".  .  . every alternate Sunday from and after 12:00 o'clock noon until 8:00 o'clock p. m., and alternate Saturday nights from 7:00 o'clock p. m. until 11:00 o'clock p. m. during each school year, and every Sunday between the said hours during the school vacation."

The defendant was required to pay, until the further order of the court, fifty dollars each month for the support and maintenance of the child. The court disallowed monthly alimony to the plaintiff.

Feeling aggrieved, plaintiff has appealed from the following portions of the interlocutory decree: (1) That portion which permits the defendant to have the child each alternate Saturday and Sunday evening. (2) That portion awarding the Dodge automobile and the three hundred dollar note to the defendant. (3) That portion denying to plaintiff permanent alimony. (4) That portion awarding fifty dollars per month for the support and maintenance of the minor child. We shall consider the several objections in the order designated.

Appellant contends that the trial court erred in giving respondent the privilege to have and visit the child each alternate Saturday and Sunday evening. It is urged that this provision will unnecessarily restrict and limit her, should she elect in the future to change her place of residence. It is sufficient to say that appellant did not raise this issue in the lower court, and, since the case is here on review, we are limited by the record as now before us. Apparently the visitation privileges were fixed by the court on the theory that appellant would continue to reside in Yakima, where the parties had resided continuously through their married life. If, at any future period,

appellant deems it necessary or desirable to change her domicile, she may apply to the trial court to modify the decree, as the court not only has inherent jurisdiction to modify its decree as the welfare of the child may require, but the trial court in this instance expressly retained jurisdiction of the cause.

■ Appellant next contends that the trial court erred in awarding the Dodge automobile and the three hundred dollar note to respondent. An examination of the record indicates that the court undertook to divide the community property, as near as possible, equally between the parties. Appellant in her complaint placed a valuation of $3,500 on the residence; $1,000 on the household furniture, and fixed the value of all of the community property at $10,000. She was awarded the residence, the household goods and furnishings, and $1,188.32 in cash. We find she was awarded substantially one-half of the community property.

■ The appellant next assigns as error the refusal of the court to allow her a fixed sum of permanent alimony in addition to the property award. As we have observed, the property was divided approximately equally between the parties. But appellant argues that, since the property awarded to her is non-income-producing, and since the truck business is the property of principal value, and inasmuch as it was acquired and established by their joint efforts during the marriage, therefore she should share in its earnings. While it is true that the property given to the appellant is non-productive, and that the property awarded to respondent is capable, at least at the present time, of showing good returns, yet it is equally true that, to produce these returns or earnings, respondent is required to give his constant care and attention to the operation of the trucks. Furthermore, there is no as-

surance that respondent's present earning capacity will continue. On the other hand, counsel earnestly argues that appellant is not entitled to alimony, in view of the amount of property she received by the decree of divorce, and contends that the case of *Lockhart v. Lockhart,* 145 Wash. 210, 259 Pac. 385, is controlling.

We can not so hold. The facts and circumstances in the case now under consideration are readily distinguishable from those in the *Lockhart* case, *supra.* There the husband, who had paid alimony amounting to $9,100 extending over a period of four years, applied to the court for relief. The court reduced the monthly payments from $150 to $100, and entered an order accordingly, from which the husband appealed, and we there said:

"She contends, furthermore, that the dental business was the property of principal value at the time of the divorce, and that, as this went to the appellant, she is entitled to a just share of its earnings. Were the business such a one as would earn a profit without the labor of appellant, there might be some justification for the claim. But it is not such a business. It has value only because he gives to it his personal efforts and attention. The good will of such a business usually follows the person, and should the appellant abandon it, it would be worth but little, if any, more than it would cost to furnish an office of like kind. . . . It is not the policy of the law, nor is it either just or equitable, that a divorced wife be given a perpetual lien upon her divorced husband's future earnings. She has chosen to go her own way, to abandon all the obligations she assumed by her marital vows, and it is only under the most unusual circumstances that she can rightfully call upon him to continuously contribute to her support."

In the above case the parties had no children. Furthermore, we held, in effect, that the wife in the *Lock-*

*hart* case, *supra,* had had ample opportunity during the five or six years subsequent to the entry of the decree of divorce to adapt herself to her new status or environment. Manifestly, it was her duty to gain employment.

But the case now under consideration presents a different situation. Here the child is still of an age needing the companionship of the mother, who will necessarily be required to devote at least a portion of her time in caring for the home and the child. This, to a certain extent, will deter and hamper her, at least temporarily, from obtaining gainful occupation.

Whether permanent alimony will be allowed or disallowed in addition to a property settlement, depends on the facts and circumstances of each particular case. Under the facts of the case now before us we do not hold that appellant is entitled to permanent alimony, because appellant, being in the prime of life, can reestablish herself in the vocation she followed before marriage, or in some other useful or gainful occupation. But in view of the fact that it will require a reasonable period of time for appellant to adapt herself to her present status, during which she will be compelled to give considerable care to the child, and in view of respondent's present earning capacity, we hold that he should be required to pay to the appellant, in addition to the property settlement made by the court, the sum of six hundred dollars as alimony, such payments to be made at the option of the respondent at the rate of fifty dollars per month.

Finally, appellant contends that the court erred in awarding but fifty dollars per month for the support and maintenance of the minor child, and insists that it is insufficient and inadequate, and that respondent should be required to contribute a greater sum, especially in view of his earning power.

Respondent's duty to his child is paramount. It is the birthright of every boy to obtain at least a general and useful education. The responsibility of providing the necessary funds to assure this advantage to the minor rests primarily on the respondent. Untold sacrifices are made by parents who remain steadfast to their marital obligations in order to educate their children. The same responsibility rests on parents who seek and obtain a divorce. Parents who remain steadfast to their marital vows are frequently compelled by thrift, perseverance and economy to accumulate savings while their earning capacity is good, so as to be able to adequately educate their children when the time or occasion arrives.

Respondent is at the prime of life. He now has an earning capacity of approximately five hundred dollars per month. He has a duty and an obligation to perform to his child which can only be fully discharged by establishing a fund, now while his earning capacity is good. Nor should the fund, which respondent shall be required to establish, be placed in the hands or under the control of appellant. To do so might possibly result in its useless dissipation. Compulsory thrift on the part of both parents is a duty they owe to their child. As this boy reaches the age of eighteen years, he may desire a vocational, technical, or professional education. By requiring respondent to make payments into a fund, some moneys at least will be available for such purpose.

In the case of *Esteb v. Esteb*, 138 Wash. 174, 244 Pac. 264, 246 Pac. 27, we had under consideration this question.

"The main and serious question in this case is this: Has the court the legal right to compel a divorced father to provide funds for a college education for his minor child whose custody has been given to the mother?"

There the wife secured a divorce on September 11, 1915, and was awarded the custody of the two minor children, Esther and Carmelita, aged twelve and seven years, respectively. The father was ordered to pay forty dollars per month until the youngest child should attain the age of eighteen years, and thereupon the payments to lapse. Carmelita, the youngest child, became eighteen years of age July 15, 1925. Prior thereto, on January 21, 1925, the mother petitioned to modify the divorce decree, alleging that the sum of sixty dollars per month was necessary in order that Carmelita might obtain a college education. At the time the petition came on for hearing the father, who had living with him his wife and two of her sons by a former marriage, was fifty-two years of age, and was employed as a conductor on a railway, earning three hundred dollars per month. We there required the father to provide the necessary funds so that his daughter, then aged eighteen, might obtain a college education. We said:

"Nor should the court be restricted to the station of the minor in society, but should, in determining this fact, take into consideration the progress of society, and the attendant requirements upon the citizens of today. . . . That it is the public policy of the state that a college education should be had, if possible, by all its citizens, is made manifest by the fact that the state of Washington maintains so many institutions of higher learning at public expense. It cannot be doubted that the minor who is unable to secure a college education is generally handicapped in pursuing most of the trades or professions of life, for most of those with whom he is required to compete will be possessed of that greater skill and ability which come from such an education."

The duty of parents to provide their children with an education is well stated by Schouler in his work on Domestic Relations (5th ed.), p. 363:

212

"The second duty of the parents is that of education; a duty which Blackstone pronounces to be far the greatest of all in importance. This importance is enhanced by the consideration that the usefulness of each new member of the human family to society depends chiefly upon his character, as developed by the training he receives in early life. Not the increase of population, but the increase of a well-ordered, intelligent, and honorable population is to determine the strength of a state; and, as a civil writer observes, the parent who suffers his child to grow up like a mere beast, to lead a life useless to others and shameful to himself, has conferred a very questionable benefit upon him by bringing him into the world. Solon excused the children of Athens from maintaining their parents, if they had neglected to train them up in some art or profession. So intimately is government concerned in the results of early training, that it interferes, and justly, too, both to aid the parents in giving his children a good education, and in compelling that education, where the parent himself, and not the child, is delinquent in improving the opportunities afforded."

We therefore hold that respondent should be required to pay, in addition to the amounts now provided for in the interlocutory decree, the sum of one thousand five hundred dollars into a fund to be used for educational purposes for the child, which sum respondent shall pay at the rate of twenty-five dollars per month for a period of seventy-five consecutive months. Therefore the interlocutory decree will be modified in the following particulars:

First: Within ten days after the remittitur shall have been filed in the court below, the respondent shall pay into the registry of the court, in addition to the amount specified in the interlocutory decree, the sum of fifty dollars as alimony for the appellant, and a like amount monthly thereafter until he shall have paid the full sum of six hundred dollars.

Second: The sum of twenty-five dollars each month for the next succeeding seventy-five months. These payments shall be deposited in such bank or trust company as the trial court may select, and the moneys shall be used and expended for the educational benefit of the child, and the moneys deposited into such fund shall be under the control and direction of the trial court, and shall not be withdrawn except by order of the court. In the event of the death of the child, all moneys unexpended and remaining in the fund shall revert to the respondent.

Each of the respective parties shall bear their own costs on appeal.

The cause is remanded, with directions to the trial court to modify the interlocutory decree in accordance with the views herein expressed.

It is so ordered.

TOLMAN, C. J., BEALS, and MILLARD, JJ., concur.