Argued October 15, 1940; modified February 4, 1941

# JACKMAN *v.* SHORT
### (109 P. (2d) 860)

*E. E. Driscoll* and *Harry D. Boivin,* both of Klamath Falls, for appellant.

*Willam Ganong,* of Klamath Falls, for respondent.

ROSSMAN, J. This is an appeal from an order of the circuit court which, responsive to a motion filed by the plaintiff, amended a decree of divorce previously

entered by that court in the plaintiff's favor. The decree, pursuant to the prayer of the complaint, dissolved the marriage contract which, prior to its entry, existed between the parties, and awarded to the plaintiff (wife) the custody of the three children of which the plaintiff and the defendant were the parents. It, however, made no provision for the support of the children. The order aforementioned, being the subject-matter of review upon this appeal, amended the aforementioned decree by ordering the father to pay to the plaintiff support money for the three children. Specifically, it directed him to pay to the plaintiff $50 each month

"  *  *  *  for the nurture and education of Barbara Jane Grafton until she reaches the age of twenty-one years or until she shall marry, whichever may be the earliest date, and that the defendant at said times pay to plaintiff the further sum of $25 per month for the nurture and education of Jack H. Grafton, Jr. until he attains the age of twenty-one years, provided, however, that if said Jack H. Grafton, Jr. goes to college on completion of his high school course, that said payments for his benefit be increased to $50 per month during the nine months of each year while he is attending college; that said defendant further pay to plaintiff for the nurture and education of Mary Anne Grafton at said times the sum of $25 per month until she attains the age of twenty-one years or until she shall marry, whichever is the earliest date, provided that if said Mary Anne Grafton goes to college, said payments for her benefit shall be increased to $50 per month during the nine months of each year during which she is at college."

Since the hearing in this court the father died and Jerry A. Short, administrator with the will annexed of the father's estate, was substituted as appellant. For the sake of convenience, we shall refer to the father as the defendant.

At the time of the entry of the order the ages of the three children were: Barbara 18, Jack 14, and Mary 12. Barbara at that time had graduated from high school, and, according to the plaintiff, was "ready for college." Jack was in high school and Mary was about to enter a junior high school. The schools to whch we refer were those of Malin. The plaintiff and her three children lived upon a farm near that place.

The bases for the awards requiring the payment of $100 per month for the nurture and education of the three children were findings that (1) fifty dollars per month was necessary for Barbara's needs while attending college; (2) the other two children's needs required $25 per month for each; and (3) the defendant was able to pay $100 per month. The defendant attacked each item of the award. He claimed not only a total inability to pay anything whatever for the support of his children but also that a college education is not within the contemplation of § 6-915, Oregon Code 1930, which authorizes courts to amend divorce decrees so as to make provision for the "nurture and education" of the children.

As we have said, the decree of divorce was entered February 28, 1938. In September of the same year the plaintiff married her present husband. The latter, the plaintiff and the three children reside in the same dwelling house. The plaintiff swore that she and her present husband are unable to maintain Barbara's expenses while she is attending college. As we have also said, the divorce decree made no award for the support of the children. The plaintiff's uncontradicted testimony indicates that when she filed her suit for divorce the defendant promised to help her take care of the children. One year, six months and ten days passed

before the motion, which instituted the proceedings now under review, was filed. In that period the defendant, according to the plaintiff's testimony, paid for the support of the children $325. According to his testimony, the sum was $395. In that year and a half the defendant visited his children only three times. He freely conceded that neither the plaintiff nor the children made any effort whatever to prevent or interfere with his visits. His last visit was made in August 1938, and his last contribution of support money was made December 8, 1938. The motion which began this proceeding was filed June 24, 1939.

When the plaintiff filed her motion she accompanied it with a supporting affidavit. After service of the citation, the defendant filed a counter-affidavit in which he claimed:

"Prior to the filing of said divorce suit, I placed the plaintiff in the ownership of real property of the value of more than $4,000, and stock of the par value of $6,000. * * * It was understood and agreed that the real property and stock was to provide for the care and maintenance of the children of said marriage. * * * "

In a reply affidavit the plaintiff swore:

"I deny that prior to the filing of the divorce suit defendant placed in my ownership real property of the value of more than $4,000 * * * and state that the only real property ever placed in my name by defendant was a hill place of approximately fifty-two acres * * * said premises were improved with an unfinished farm-house * * * . Shortly after placing the said premises in my name (said premises having originally been purchased for $1,200) the defendant compelled me to borrow $1,200 on the same and mortgage therefor was given, which said mortgage has never been paid. * * * That the $1,200 received

on said loan was kept and retained by said defendant. * * * The only stock ever turned over to me by defendant was capital stock in said Grafton-Jackson Company which said stock was then, ever since has been, and now is worthless and of no value whatever; that said corporation is not now and has not been since our said divorce engaged in any business, and said corporation has no assets whatever. * * * With reference to the real property above mentioned, said defendant has frequently said, not only to me but to others, that my children and I could not possibly make a living from the same, and that we would starve to death if we depended for our living upon said premises; that it was not the understanding at any time that said property was conveyed to me to provide for the care and maintenance of said children.''

After the above affidavits had been filed a hearing was held before the circuit judge who subsequently made the order under review. During the course of the hearing the aforementioned real property and corporate stock were not mentioned. From this circumstance we assume that a conclusion is justified that the stock was worthless and that the land was encumbered to its full value.

We shall now review the part of the evidence which indicates the defendant's earning capacity. He was engaged in the business of growing, buying and selling potatoes. His experience in that line of business has extended over a period of fifteen years. The record does not indicate whether he possessed a bank account or owned property; nor does it mention the amount of his invested capital. He swore that he purchased potatoes in the states of Oregon, Washington and California and shipped them to any place that offered a market. He said, ''I operate in Shafter County and other counties.'' Again, referring to Shafter County

which, he said, is in California, he swore, "I operate down there through April, May and June and then I spend the rest of the year here" (Klamath Falls). Apparently, Shafter is not a county but is a California city. In 1938 he purchased and shipped about 350 cars of potatoes and estimated that they were worth $250 per car. Some years he shipped 600 cars. At the time of the hearing he had ten or twelve contracts with growers which bound him to purchase and them to sell to him the yield of their land. These potato contracts further required him to hire men "to row them and make them fit for food purposes." After his acceptance of the potatoes he was compelled to warehouse them and subsequently forward them to the buyers. His contracts also required him to make advances from time to time to the growers so as to finance their operations. At the time of the hearing these advances amounted to "several thousand dollars" so the defendant said. Up to the time of the hearing (September 7, 1939) the defendant had spent in 1939 $1,185.15 for his own personal expenses, or approximately $131 per month. He described these as "personal expenses."

The defendant claimed that his affairs were in a bad way. He swore that he was operating upon borrowed money and that if compelled to liquidate he "would be behind at this time." In explanation of these claims of adverse circumstances, he did not indicate whether he owned any real or personal property nor whether he possessed a bank account. If he had an automobile that fact was not mentioned. Where or with whom he lived was not disclosed. Whether he could reduce his personal expenses below the monthly average of $131 was not touched upon. He claimed

that although 1936 "was very prosperous" for those engaged in the potato business, the years 1937 and 1938 brought losses. The year 1939 which was then nine months old he described as "just starting out now. I have no idea." But Mark Evans, a witness called by him, who was also engaged in the potato business, swore, "The average today is probably ten or fifteen per cent higher than it was last year at this time." The defendant testified that someone by the name of W. E. McDonald held a judgment against him of "around $1,200, I believe." No other information concerning the judgment was given. The identity of W. E. McDonald was not divulged.

The plaintiff testified that while the defendant resided with his family he contributed $300 per month for the household expenses, with the exception of the year before the divorce when his monthly contributions were approximately $200. When asked about these contributions, the defendant professed an inability to say anything about them "without going back into the books." The plaintiff swore that after the divorce the defendant told her that he "was making a great deal of money." Upon cross-examination, she testified: "I know that his business is the same as it was before, and in fact that it is much better than it was before, and he doesn't have the overhead to carry that he did have." It seems as though the plaintiff possessed a letter written by the defendant upon which she depended in part for the statement just made. At this point defendant's counsel asked her: "Will you just read to the Court that particular portion of the letter which refers to the money that he was making." Her response, as indicated by the record, was: "A. (reading) I have just been lucky in business and would

like to do lots for you and the kids.'' The letter did not become an exhibit and is not before us, but seemingly it was written in August 1938. Barbara, the 18-year-old daughter, testified that on one of the defendant's visits to her he said he ''had been lucky in business and that he would do a lot for us.'' Jack, the 16-year-old son, testified that he, too, heard the statement. The defendant did not deny that he had made those statements, but, referring to them, said: ''I had recently made some business connections that looked like they were going to be quite profitable.'' He did not explain whether his expectations had worked out.

The above, we believe, constitutes a fair review of the part of the testimony which reveals the defendant's financial condition.

We shall now mention that part of the testimony which concerns the children's needs and Barbara's educational program. According to the mother, the living expenses of each of the two younger children were $25 monthly. Both the mother and Barbara testified that Barbara had investigated the cost of a student's attendance at Oregon State College and had found it to be $54 per month, apart from providing clothing, laundry, railroad fare and medical and dental attention. Barbara further swore that she had also investigated the cost of attendance at Stanford University, but had abandoned thought of pursuing an education there upon discovering the amount of the tuition fees. Concerning Oregon State College she said, ''I figure if I can get something to do I can get by on $50.'' She did not mention the course of study which she proposed to pursue nor indicate the grades and record which she had made at high school. The defendant asked no questions whatever concerning

her ability to profit by a college education, nor did he indicate any interest in her record at high school. In fact, his attorney asked neither the mother nor any of the children any questions concerning the children's educational programs nor the cost of their maintenance. If he ever discussed with the children their educational problems, he did not mention the matter when upon the witness stand.

We see from the above that the mother, she being the one to whom the court entrusted the custody of the children, has decided that Barbara ought to go to a college and that the daughter is desirous of so doing. We also see that the evidence indicates that $50 per month for Barbara and $25 per month for each of the other two children is necessary.

■■ Let us now determine whether the evidence reviewed above supports the lower court's finding that the defendant is able to contribute $100 per month for the support of his children. If the evidence leaves doubt and uncertainty concerning his ability to pay, the issue occurs: upon whom should fall the consequences for having failed to remove the doubt and the uncertainty. A very valuable rule for the weighing of evidence is set forth in subdivision 6 of § 9-2001, Oregon Code 1930, which says:

"The evidence is to be estimated not only by its own intrinsic weight but also according to the evidence which it is in the power of one side to produce and the other to contradict."

Most men are able to support their children. They willingly change from a nonprofitable to a profitable occupation if necessary; they resort to borrowing, to self-sacrifice; they stint themselves, and even go hungry before subjecting their children to want. This

being true, and the opposite being almost a phenomenon, we have the basis for a strong inference that the defendant, in the absence of some unusual circumstances, must have had the means to provide for his children. Ordinarily, women who are taking care of the home and the children (like the plaintiff's three) have no time to familiarize themselves with the earning power of the husband's business, and therefore when his financial affairs become the subject of judicial inquiry, as in the present case, they cannot produce extensive data concerning them. But the husband can and is subjected to no unfair disadvantage when required to do so. We observe that the transaction of the defendant's business extended over three states and necessitated his absence from home for extensive periods of time. Manifestly, the plaintiff had but limited opportunity to get at the facts, whereas the defendant's power to show the lack of merit, if any, of the evidence she produced was complete. This then is a good case in which to apply the above-quoted statutory rule. The defendant's evasive and at times categorical denials were unaccompanied with any affirmative showing. His oft-repeated professions of ignorance concerning matters of which he must have had some knowledge seem puny. This man, who must have had account books, deposit books and other records of his business transactions, elected to produce none of them, but to depend on mere denials of what his former wife and his children said concerning his ability to support the latter. Not one word did he say about the size of his bank account nor whether he owned property. The very fact that he was able to defray monthly personal expenses of $131 indicates that he possessed some resources. Their nature he

did not disclose, except to say that he was compelled to borrow money. It is our belief that since the defendant had complete knowledge of the facts and almost exclusive control over the source of the evidence, a mere denial of the proof which the plaintiff was able to muster did not suffice. That being true, her evidence must be deemed a better source of the truth than his, especially in view of the fact that the trial judge who saw the witnesses believed her. In fact, we do not think that the defendant had confidence in his own denials. We are satisfied that he adopted the course which he took because the plaintiff remarried and his children are now living under the same roof with the plaintiff's new husband. But even such a situation, however distressing it may have been to the defendant, did not relieve him of his duty to support his children. We believe that the defendant possessed the ability to support his three children.

■■ Since we believe the defendant had the ability to support his children, and did not contend that $25 per month was an excessive amount for each of the two younger children, that part of the order, at least, must be affirmed. We shall now determine whether the circuit judge was entitled to take into consideration, in fixing the amount to be awarded for nurture and education, the additional expenses required for a college education for Barbara. The defendant insists upon the negative. Section 6-914, Oregon Code 1930, says:

"Whenever a marriage shall be declared void or dissolved, the court shall have power to further decree as follows: 1. * * * 2. For the recovery from the party in fault, and not allowed the care and custody of such children, such an amount of money, in gross

or in installments, as may be just and proper for such party to contribute toward the nurture and education thereof.''

Section 6-915, Oregon Code 1930, grants to the court which entered the decree power ''to set aside, alter or modify so much of the decree as may provide for the appointment of trustees for the care and custody of minor children, or the nurture and/or education thereof.'' The section of our code last mentioned authorizes the entry of an order requiring support of the children born of the union even if the divorce decree was silent upon the subject: *Mack v. Mack*, 91 Or. 514, 179 P. 557, and *McFarlane v. McFarlane*, 43 Or. 477, 73 P. 203, 75 P. 139.

Chapter 80 of Oregon Laws of 1935 says that ''In this state any person shall be deemed to have arrived at majority at the age of twenty-one years.'' When a child reaches the age of majority, and thus ceases to be a ward of the courts, the authority conferred by the above sections of our laws to make provision for his nurture and education ceases. *Mack v. Mack*, supra.

■ The above statutes conferred upon the circuit judge the authority to require the defendant to contribute for ''the nurture and education'' of Barbara. But the argument is made that a college education is not within the contemplation of those statutes. However, since Barbara proposes to go to Oregon State College where the fees for tuition and student activities are modest, we assume that it will not cost much more to maintain her there than at any other place. The intimation is made that the purpose of an education is to so train the student that he can make money.

If that were the only object of an education there would be more point to the contention that Barbara ought to go to work and earn her own living. But the purposes of education have not become entirely commercialized. One of the principal purposes of an education is still to train the young for the discharge of their duties to society and to afford them such knowledge of our government and American institutions that upon reaching majority they will intelligently perform their part in the great social order. The capacity to discharge those duties is especially demanded in a country such as ours. Hence, the needs of society and government, as well as the needs of the family, must be taken into consideration in the construction of the words "contribute toward the nurture and education thereof." When the duties of citizenship are to be discharged nothing less will be expected of the children of divorced parents than of those who come from homes where the marital ties remained intact.

Blackstone, almost two centuries ago, stated the legal principle which governs the issue under consideration. He wrote:

"The last duty of parents to their children is that of giving them an education suitable to their station in life; a duty pointed out by reason, and of far the greatest importance of any. For, as Puffendorf very well observes, it is not easy to imagine or allow, that a parent has conferred any considerable benefit upon his child by bringing him into the world, if he afterwards entirely neglects his culture and education, and suffers him to grow up like a beast, to lead a life useless to others, and shameful to himself.  *  *  *  " (Blackstone's Commentaries, Lewis's Ed., p. 424)

Schouler, in § 774 of his treatise on Marriage, Divorce, Separation and Domestic Relations, states the same principle as follows:

"The second duty of parents is that of education: a duty which Blackstone pronounces to be far the greatest of all these in importance. This importance is enhanced by the consideration that the usefulness of each new member of the human family to society depends chiefly upon his character, as developed by the training he receives in early life. Not the increase of population, but the increase of a well-ordered, intelligent, and honorable population is to determine the strength of a State; * * * Solon excused the children of Athens from maintaining their parents, if they had neglected to train them up in some art or profession. So intimately is government concerned in the results of early training, that it interferes, and justly, too, both to aid the parent in giving his children a good education, and in compelling that education, where the parent himself, and not the child, is delinquent in improving the opportunities offered. * * * *"

The decision generally cited against the inclusion of a college education as one of the necessaries which a parent must provide for his children is *Middlebury College v. Chandler,* 16 Vt. 683, 42 Am. Dec. 537. To it the defendant adds *Streitwolf v. Streitwolf,* 58 N. J. Eq. 570, 43 Atl. 904, 45 L. R. A. 842, and 14 R. C. L. 258.

The plaintiff cites the following authorities in support of her contention that a college education, when warranted by the circumstances, is within the contemplation of statutory provisions like that of our above-quoted laws, or within the purview of the common law rule which renders a parent liable for necessaries supplied to his minor child: *Esteb v. Esteb,*

138 Wash. 174, 244 P. 264, 246 P. 27, 47 A. L. R. 110 (annotation at p. 118); *Refer v. Refer*, 102 Mont. 121, 56 P. (2d) 750; *Feek v. Feek*, 187 Wash. 573, 60 P. (2d) 686; and 17 Am. Jur. 531.

We shall now review the above-cited authorities. The Middlebury College suit was not against the father, but against the son, an infant. It was based upon the common law principle which renders an infant liable for necessaries. The youth's father was dead and the suit was filed to render the boy liable for his "quarter bills as a student in the college." Before his death the father had brought his son to the institution and had paid for his first year's expenses. After the father's death his estate paid for the second year's expenses, and this suit was apparently concerned with the third year's. The son had never agreed to pay any of the college's charges. The college contended that the service for which it sought to charge the student with liability was a necessary. In passing upon the issue, the court first ascertained the meaning of the term "necessaries." It said:

"The practical meaning of the term has always been in some measure relative, having reference as well to what may be called the conventional necessities of others in the same walks of life with the infant, as to his own pecuniary condition and other circumstances. * * * a good common school education at the least, is now fully recognized as one of the necessaries for an infant. Without it he would lack an acquisition which would be common among his associates, he would suffer in his subsequent influence and usefulness in society, and would ever be liable to suffer in his transactions of business. Such an education is moreover essential to the intelligent discharge of civil, political and religious duties."

But the court felt that "the more extensive attainments in literature and science" partook primarily of the nature of elegance, intended to adorn the personality and add to the pleasure of life, rather than as practical helps in the solution of the everyday problems. It said: "The mass of our citizens pass through life without them." It is evident that the court thought that some education beyond "a good common school education" might be deemed a necessary for which a liability could exist, because it said: "I would not be understood as making any allusion to professional studies, or to the education and training which is requisite to the knowledge and practice of mechanic arts." It held: "We therefore consider that such an education should not be ranked among those necessaries for which he could, as an infant, render himself absolutely liable by contract." See 27 Am. Jur., Infants, § 19, p. 762.

Before passing on to the next decision, we pause to observe that the Middlebury College decision was rendered approximately one hundred years ago, and undoubtedly some of the court's observations concerning a college education have lost their force.

The Streitwolf decision set aside an order made by a court which had divorced the parents of a 19-year-old son and which a year after the entry of that decree ordered the father to pay $135 for the son's tuition and law books while he was enrolled in a night law school. No order had been made giving the custody of the boy to either parent. Before the entry of the order the father had paid for the son's tuition and keep while he was attending Peddie Institute in New Jersey. The boy, however, was expelled from that institution. The father was strongly opposed

to his son's attendance at the law school and wanted him "to do something practical." He found for his son a place in a business house in New York City which he did not keep. The father was willing to obtain for him another place. The court defined a necessary as follows:

"The necessity that is the criterion of validity is not mere physical necessity, but rather social and moral propriety, having regard to the situation of the parties and the fitness of things. Food, shelter and clothing are physical necessities. In an enlightened community the common education of a child is a moral and social necessity. Professional training is not a general necessity, but is a special advantage. Whether a young man should study a profession is a question usually determined for him by his parents, especially by his father, * * * ."

The court held that the father was not liable for the tuition and books. It will be observed that the son's custody had not been taken from the father.

In *Ziesel v. Ziesel,* 93 N. J. Eq. 153, 115 Atl. 435, 18 A. L. R. 896, (annotated at p. 899), the same court held that an order requiring a divorced father, whose income was $4,500 per year, to pay to his former wife $520 annually for the support and maintenance of their 16-year-old son, and $980 additional for the boy's board and tuition in a boarding school "is excessive in so far as it represents expenses for education in a boarding school rather than in a public high school, in view of the fact that the father believes, with some showing of reason, that attendance at a public high school is adequate and preferable for his son."

The Esteb decision came from our neighboring state to the north. It was predicated upon the same issue that is now before us. In 1915 the parents of two

daughters were divorced by a decree which gave their custody to the mother. Later, one of the daughters came of age and at the same time the other (Carmelita) reached the age of 18. Then the mother filed an application for an order to require the father to contribute $60 per month for the support of Carmelita who had entered the College of Puget Sound. Carmelita was showing unusual aptitude in the course of study which she was pursuing. Her purpose was to become a teacher of English. The order was made. The decision which we are now reviewing, in sustaining the order, analyzed all of the authorities above cited and others. It said:

"The rule in Middlebury College v. Chandler, supra, was clearly based upon conditions which existed at that time. An opportunity at that early date for a common school education was small, for a high school education less, and for a college education was almost impossible to the average family, * * *. But conditions have changed greatly in almost a century that has elapsed since that time. Where the college graduate of that day was the exception, today such a person may almost be said to be the rule. * * * That it is the public policy of the state that a college education should be had, if possible, by all its citizens, is made manifest by the fact that the State of Washington maintains so many institutions of higher learning at public expense. * * * Our conclusion is that, since the mother has the custody of this child, knows its character and ability, she is in a position to determine what education it should have, what course should be pursued * * *."

One of the members of the court dissented, but said:

"I am ready to somewhat reluctantly yield to the amount of the award viewing the needs of the child apart from her claimed educational necessities."

In the Refer case, the facts were: The plaintiff and the defendant were divorced in February, 1933, by a decree which awarded to the plaintiff (the mother) the general custody of their two sons, Lloyd and Duane, but made no provision for their support. In 1935 the plaintiff filed a motion praying that the defendant be required to contribute "specific amounts of money to provide higher education for Lloyd Refer" who by that time had reached the age of 17, had finished his high school work and was desirous of taking a course in electrical engineering in the state college at Bozeman, Montana. The lower court entered an order requiring the defendant to pay $35 per month for the purpose of defraying the expenses of Lloyd while attending Bozeman College. In the decision under review that order was affirmed. After stating the defendant's contentions, which included claims that he could not be required to provide his son with a college education, the court said:

"We think there is small merit in any of the contentions advanced in behalf of the defendant, and we deem it unnecessary to incumber the record with citations to the contrary from numerous authorities cited by plaintiff and others investigated."

In the Feek decision, the Washington court again held that a father, whose wife had divorced him, could be required to provide a college education for their son. The latter was in the mother's custody. At the time of the application the son was 18, had completed a high school course and was desirous of taking a forestry course at the University of Washington. The decision says:

"While the duty of a father to provide for his minor child, then in the custody of another person, is limited to necessaries, the question to what extent, or

what kind of, an education is necessary is a relative one, dependent upon all the facts and circumstances of the particular case. * * * In this case, the education sought by the minor is intended to fit him for a vocation in life, and we think that under all the facts and circumstances presented by the evidence, the court was justified in requiring the appellant to provide funds for that purpose and upon the terms prescribed.''

The two treatises cited by the parties bear upon the problem before us. Section 35 of 14 R. C. L., Infants, p. 257, says:

''Some kind of education has been included from early times within the class of necessaries for which an infant may contract. The early cases, however, seem to have confined this to elementary or vocational education, and even in the later cases a college, university or professional education has been generally excluded.''

It will be observed that that language speaks of the liability of the infant, as in the Middlebury College case. We, however, are concerned with the liability of the parent. Section 696 of 17 Am. Jur., Divorce-Separation, cited by the plaintiff, says:

''It is clearly within the power to make a proper order touching the education of the child such as the circumstances of the parties and the nature of the case shall render reasonable and just. The view has been taken that the father may be required to provide his minor child with a college education if the child has evinced an aptitude therefor.''

To the above decisions there should be added: *Hilliard v. Anderson,* 197 Ill. 549, 64 N. E. 326; *Morris v. Morris,* 92 Ind. App. 65, 171 N. E. 386; *Luques v. Luques,* 127 Me. 356, 143 Atl. 263; *Underwood v. Underwood,* 162 Wash. 204, 298 P. 318; *Payette v.*

*Payette*, 85 N. H. 297, 157 Atl. 531; *Stoner v. Weiss*, 96 Okla. 285, 222 P. 547; *Tribe v. Tribe*, 59 Utah 112, 202 P. 213.

In the Hilliard case, the parties were divorced in 1900 by a decree which ordered the defendant (husband) to pay to the plaintiff $35 per month for the support of their daughter, who was then about 14 years of age. Shortly the mother moved for an increased allowance so that she could enroll the daughter in a boarding school called "Watterman Hall." Before the suit for the divorce was filed the defendant had entered his daughter in that institution. The expenses were $650 per year. In allowing the motion, the court ordered the father to pay $60 per month to defray the daughter's expenses. In sustaining the order, the decision under review said:

"The duty of the appellant, which the court is here called upon to enforce, is to maintain and educate his daughter in a manner befitting his condition and circumstances in life. * * * Providing a child with proper and suitable education is now generally recognized and enforced by the courts as one of the duties of a parent, the means and ability of the parent being kept in view. * * * It is not apparent there is any necessity she should be taken from Watterman Hall and given such education as she might receive in the public schools, as appellant suggests should be done * * * ."

In the Morris case (Ind. App.), the facts were that in 1922 the parties were divorced upon the suit of the wife by a decree which gave her the custody of their child John, 9 years of age, and ordered the father to pay $50 per month for John's support. In 1929 the father filed a petition in which he stated that he had remarried, that his family now consisted of his new

wife and her children by a former marriage, that his income was not as large as at the time of the divorce, that John was now 17 years of age, that he had completed his high school course and was able to support himself. It prayed that the father be relieved of the requirement to make the monthly payments. The mother replied that John was still in her custody, that he was desirous of entering college, and that the $50 per month was necessary for that purpose. The decision held that the duty of the father to provide for his minor child "is confined to necessaries" and that a college education for John was not a necessary. Seriously weakening that decision is evidence that it was hurriedly written. For instance, it described *Middlebury College v. Chandler,* supra, as "an action to recover from a father of a minor son certain expenses." The court failed to discern that in the Middlebury College case the son, and not the father, was the defendant. The father had been dead for more than a year before the case was filed. Certainly, a parent's liabilities for necessaries are greater than those of his infant child. After having made the mistake just mentioned, the court said concerning the Middlebury College decision, "We concur in that view." Pertaining to the Esteb decision, supra, it said "Under the peculiar facts of the Esteb case, the conclusion of the Washington Supreme Court was right but the reasoning of the court in its opinion, to which one of the judges dissented, does not meet our approval." It is difficult to see how the conclusion could have been right if the reasoning was wrong. The conclusion made provision for a college education. The reason for the conclusion consisted of the fact that such an education was a necessary. The court (Ind.

App.) held that there should be stricken from the decree the provision for John's support.

In the Luques case (Me.) the husband had been granted a divorce from his wife. By virtue of an agreement between the parties, the court had ordered the husband to pay his wife $35 weekly for her support and that of their minor child who was in the custody of the wife. The child was, in fact, their grandchild, but it had been adopted by the two upon the death of their daughter. Some time after the entry of the decree the ex-wife filed a petition in which she stated that $35 weekly was not sufficient ''to properly educate the minor child and fit her for a vocation in life, she having more than ordinary musical talents.'' She prayed that the decree be amended so as to require payment of additional sums toward the expense of a musical education. The ex-husband, in turn, claimed that a musical education was not a necessity. The court said:

''Whether the expense of a musical training can be deemed a necessity at common law is not determinative of the power of the court under the divorce statute of this state to order a parent to contribute to the care and support of a minor child, a divorce having been decreed. Section 14, c. 65 R. S. authorizes the court granting a divorce to decree concerning the 'care, custody and support' of any minor child.''

It pointed out that the kind and degree of care and support

''is not specified in or limited by the statute. * * * The legislative consideration for the vesting in the courts the authority to decree concerning the care and support of a minor child was the welfare of the child and not the common law liability of either parent. * * * The purpose of this provision of

the statute should be held to be to provide for minor children who are deprived of the care and training that naturally flow from a united home, sufficient means, within the ability of the parents, to furnish them not only with support, but with proper training to insure their finally becoming self-supporting and useful members of society."

It declared that care and support must be held to include not only food, clothing and shelter, but, whenever a parent is able, vocational training provided the child has special talents. The court pointed out that ordinarily these matters are entrusted to the father when the marital ties remain unbroken, but that when they have been severed the statute authorizes the court to act. It held that the sum sought was within the statutory provisions of care and support and that the lower court had not abused its discretion in making the award.

Of the decisions which we have so far considered, the Luques opinion is the first one which was concerned with a statutory provision regulating the award of support money for the minor. It will be recalled that the words of our statute are: "contribute toward the nurture and education thereof."

The Underwood decision is another expression by the Supreme Court of Washington upon the issue which we are considering. That decision disposed of an appeal taken by the wife from a decree of divorce which, in addition to severing the bonds of matrimony, gave her the custody of their 12-year-old son, awarded her $50 per month for the child's support, and a part of the property accumulations of the couple. Upon the appeal the mother argued, among other matters, that the award of $50 monthly for the boy's support

was inadequate. In deciding this contention, the court said:

"Respondent's duty to his child is paramount. It is the birthright of every boy to obtain at least a general and useful education. The responsibility of providing the necessary funds to assure this advantage to the minor rests primarily on the respondent. Untold sacrifices are made by parents who remain steadfast to their marital obligations in order to educate their children. The same responsibility rests on parents who seek and obtain a divorce *  *  *. Respondent is at the prime of life, he now has an earning capacity of approximately $500 per month. He has a duty and an obligation to perform to his child which can only be fully discharged by establishing a fund, now while his earning capacity is good.  *  *  *  "

The decision required the father to establish a fund of $1,500 for the future education of the boy by paying into it $25 per month for 75 months, the money to be deposited in a bank selected by the trial court. These payments were required in addition to the $50 per month support money.

The Payette decision (N. H.) affirmed an order which denied a petition submitted by the father of a 19-year-old son in which the father sought to be relieved from a provision of a divorce decree which required him to pay $80 per month for the support of his former wife and their son. At the time when the petition was filed the boy was attending a college. The father contended that he could not be required to contribute to the maintenance of a son who, although able to support himself, had elected to pursue a college education. In rejecting this contention, the court held that the award of an allowance in divorce

proceedings for the support of a child is much within the discretion of the trial court. It then said:

"While there are decisions under the statutes of other jurisdictions which hold that a parent in divorce proceedings can not be required to furnish support to a minor child who is attending college, the cases which reach the contrary opinion appear to be more in accord with the liberal view which prevails in this state."

In the Stoner decision the Oklahoma court sustained an order which amended a divorce decree and which required the father to pay $20 per month into a fund for the use and benefit of his minor child. A statute of that state authorized divorce decrees to make provision for the "support and education of the minor children of the marriage." The father, in attacking the above-mentioned provision, claimed that its entry exceeded the court's authority "because the court found that the child did not require this additional money for its present support." In holding that the order was valid and within the purview of the above-mentioned statutory provision, the decision said:

"It was the intention of the trial court to provide for the future of this child, and, as far as possible, to accumulate a fund in addition to the amounts required for the present needs of the child from which the child might be properly supported and educated. * * * The statute does not require that the fund provided for the custody, support and education of the child should be for its immediate support, and there can be no good reason for holding that the court cannot provide a fund which, if properly safeguarded, will enable the child to have an education * * * . The court was authorized to provide for the support and education of the minor and was authorized to make all reasonable orders to see that the money paid was used for the support and education of the minor."

The Tribe decision (Utah) sustained the validity of a paragraph of a decree attacked by the divorced father which said:

" *  *  *  and in addition thereto the sum of $20 per month from said date for the support, care, maintenance and education of said minor child George Vernon Tribe for a period of 10 months in each year of his minority beginning September 1st and ending June 30th."

Three years after the entry of the decree the defendant had made none of the payments and, being charged with a contempt of court, moved the court to amend the decree by striking from it that provision. He contended that the support money was no longer necessary and that his son was fully capable of earning his own livelihood. It appeared that the boy's ambition was to pursue a course of study at the University of Utah which would train him to become an automobile engineer, that he had matriculated in the university, but was shortly forced to abandon his course of study because of the defendant's failure to make the monthly payments. At that point the son secured profitable employment with the purpose of earning enough so that he could return to the university. The court sustained the attacked order and held that the lower court did not err when it refused to strike from it the provision calling for monthly payments of $20. It held that the required payments were for the support, care, maintenance and education of the boy without discussing specially the educational feature.

So far as we are advised, the above constitutes a review of all the authorities which bear upon the issue awaiting an expression of our views. It will be ob-

served that, unlike the Middlebury College case, this is not an effort to hold a minor liable for the cost of his education. Nor are we now concerned with the period of a century ago when ''the mass of our citizens passed through life without them''; that is, college educations. The two New Jersey decisions can readily be distinguished. In the one the father, who shared in the custody of his son, was asked to pay for the latter's education in a night law school. The father was opposed to such a course of study, but was entirely willing to pay for his son's general education; in fact, he had placed the boy in an educational institution of good standing from which the boy, however, was later expelled. The truth is, he was twice expelled. After the second expulsion the father obtained for the boy a place in a business institution which the boy shortly lost, but the father was willing to try again. It should be observed that the father's parental rights in the child had not been terminated by the decree of divorce, nor had his interest in the boy's welfare ceased. The other New Jersey case was one in which a father with an income of $4,500, and who had four children, was asked to pay $1,500 per year to maintain his 16-year-old son in a boarding school when public high schools were available. The father in good faith preferred the public school. The only other decision adverse to the plaintiff is the one reviewed above rendered by the Indiana Appeals court. In holding that the father had been properly relieved of monthly payments of $50 for the benefit of his 17-year-old son, the court said of the Middlebury College decision: ''We concur in that view.'' The court misconstrued that decision. Referring to it, it said that ''was an action to recover from a father.''

As we have already said, the son, and not the father, was the defendant. The latter was dead. The Indiana court was apparently much persuaded by the fact that the boy's mother possessed an adequate income, whereas the father, after remarrying, had acquired a new family.

■ We believe, as did the Maine court in the Luques decision, that some attention must be paid to the fact that the common law rule rendering a father liable for necessaries has been supplanted with a statutory provision. The Maine statute authorized the divorce court to enter a decree for the "care, custody and support of any minor child." Our statute gives the divorce court power to enter in the decree a provision "for the recovery from the party in fault and not allowed the care and custody of such children, such an amount of money * * * as may be just and proper for such party to contribute toward the nurture and education thereof." Generally, the purpose of new statutes is to get rid of old ideas. Hence, it may be assumed that in passing that statute the legislature desired to supplant or make a change in the old liability. The phraseology of the Maine statute, it will be observed, did not include the word "education"; ours does. Since the Maine statute, without the use of that word, was sufficient to authorize the court in an appropriate case to require the father to pay for his child's college education, ours certainly is. But we will not permit ourselves to be persuaded by one decision alone. The Washington court, without the help of any statute like ours, has three times held in well-reasoned decisions that a divorce court may exact of the father moneys for the education of his children in institutions of higher learning. It will

also be observed that the courts of Illinois, Montana, New Hampshire, Oklahoma and Utah held to like effect. They experienced no difficulty whatever in reaching their conclusions. Whether as necessaries within the contemplation of the common law rule, or as a provision for education within the purvew of our statute, we believe that awards for a college education made in behalf of a child displaying sufficient capacity are permissible. Reason, as well as the public policy of this state, favorable as it is to higher learning, permits no other conclusion. The high esteem in which college training is held in this state is unmistakably indicated by the numerous colleges found in the various parts of this state. Ordinarily, a child of divorced parents is in greater need of the help that a college education can give than one living in a home where marital harmony abides.

■ We have not overlooked the fact that neither the mother nor Barbara testified to the grades received by the latter while she was passing through high school. But grades alone do not suffice; attitude, character, desire for learning, and well-directed ambition are important. A willingness to work is by no means unimportant. Whether a child should be sent to college is ordinarily a problem for settlement within the family circle. A father who has lost the custody of his child by an adjudication of a court is asking that a most difficult task be performed if he insists that his child must be subjected to an aptitude test before he can be required to provide funds for its further education. He ought to be required to abide by the decision of the mother concerning aptitude, unless the mother's decision is reached for a vindictive purpose, lacks adequate support in the facts, or for some other reason clearly

wrong. In the present instance, the mother has seen to it that the other two children, as well as Barbara, attended school. The defendant, who challenged the right of Barbara to further progress with her schooling, manifested no interest in any of the children's grades or in any other feature of their schooling. It was as much his parental duty as that of the mother to know the children's grades and take an interest in their educational progress. He did not contend that any improper influence prompted the plaintiff to move for an allowance of money for Barbara's further education; nor did he say a word indicating that Barbara lacked the ability to profit by further education. The following facts indicate that very likely Barbara is fit material for matriculation at a college: (1) she completed her high school education; (2) she is willing to earn a part of her expenses; and (3) her mother believes that she is entitled to go further with her education. We think that these facts, in the absence of anything to the contrary, suffice as a foundation for a conclusion that Barbara has the necessary aptitude.

■ The issue remains, how much is the defendant able to contribute toward the nurture and education of his three children. Three members of this court have carefully read the transcript of evidence and all five members who heard the argument have bestowed careful attention upon this cause. We believe that, in view of the defendant's protestation of burdensome debts and of adverse business conditions, $75 per month is the limit of his ability to contribute to the nurture and education of his three children. The award of the circuit court will, therefore, be reduced from $100 per month to $75 per month. The payments will be

made to the plaintiff for the nurture and education of all three children. If, after providing nurture for all three children and defraying expenses of the local school education of the two younger ones, enough remains to help Barbara attend college, the unexpended sum may be used for that purpose. Such use of it will be within the purview of our above mentioned laws. Under these circumstances, at least $25 per month will be available for Barbara.

Since the father died after the entry of the decree, the situation presents no occasion for determining the validity of that part of the order which contemplates a college education for the two younger children.

The order of the circuit court is modified as above indicated.

KELLY, C. J., and RAND, BELT and LUSK, JJ., concur.

BEAN and BAILEY, JJ., did not participate in this decision.