Helen Matlock NASH,
Plaintiff/Appellant,

v.

Charles MULLE, Defendant/Appellee.

Supreme Court of Tennessee,
at Nashville.

Jan. 19, 1993.

Phillip Robinson, Philip E. Smith, Nashville, for plaintiff/appellant.

John J. Hollins, Robert L. Jackson, Nashville, for defendant/appellee.

OPINION

DAUGHTREY, Justice.

This child support case presents two principal issues on appeal: (1) the extent to which Tennessee's Child Support Guidelines apply to an obligor's net monthly income in excess of $6,250.00, and (2) the extent to which a trust fund established during the child's minority for her later college education is permitted under Tennessee law. We conclude that the trial judge is not limited to the ordinary schedule in calculating the amount of support to be paid by a wealthy non-custodial parent, and we uphold the use of a trust fund under the circumstances presented here, even though the benefits will be realized after the child reaches the age of majority. Thus, we reverse the judgment of the Court of Appeals and remand the case to

the Juvenile Court for the recalculation of an award in accordance with this opinion.

The essential facts in this case are not in dispute. What is contested is the extent of the child support obligation of Charles Mulle, who fathered Melissa Alice Matlock as the result of an extramarital affair with the appellant, Helen Nash, in 1981 but has since had nothing to do with mother or child. After an order was entered establishing his paternity in 1984, the Juvenile Court also ordered him to pay $200.00 each month in child support, in addition to other specified expenses. In 1990, Helen Nash filed this action seeking an increase in the amount of his payments because of Charles Mulle's dramatically increased income.[1] The Juvenile Court then ordered Mulle to pay $3,092.62 per month, with $1,780.17 reserved for a trust fund established for Melissa's college education. The Court of Appeals reversed, limiting the award to $1,312.00 per month, or exactly 21 percent of $6,250.00, the top monthly income to which the child support guidelines explicitly apply. The Court of Appeals also disallowed the trust, finding that it improperly extended the parental duty of support beyond the age of majority. Because the facts are not disputed, we review *de novo* the questions of law presented on appeal.

Child support in Tennessee is statutorily governed by T.C.A. § 36–5–101. Section 36–5–101(e)(1) provides that "[i]n making its determination concerning the amount of support of any minor child ... of the parties, the court shall apply as a rebuttable presumption the child support guidelines as provided in this subsection." The General Assembly adopted the child support guidelines promulgated by the Tennessee De-

partment of Human Services in order to maintain compliance with the Family Support Act of 1988, codified in various sections of 42 U.S.C.[2] While they add a measure of consistency to child support awards statewide, the guidelines provide more than simple percentages to be applied against the net incomes of non-custodial parents. They also embody "the rules promulgated by the Department of Human Services in compliance with [the] requirements [of the Family Support Act of 1988]."[3] Hence, the purposes, premises, guidelines for compliance, and criteria for deviation from the guidelines carry what amounts to a legislative mandate.

## I.

■ The first issue presented concerns the proper measure of child support to be awarded in this case in view of the fact that Charles Mulle's monthly income exceeds $6,250.00. The guidelines apply in *all* cases awarding financial support to a custodial parent for the maintenance of a child, whether or not the child is a welfare recipient, and whether or not the child's parents are married. The guidelines are based, however, on several goals; they make many assumptions; and they permit deviation in circumstances that do not always comport with the assumptions. In studying the goals, premises, and criteria for deviation, we are convinced that the guidelines permit a monthly award greater than $1,312.00 without a specific showing of need by the custodial parent.

■ One major goal expressed in the guidelines is "[t]o ensure that when parents live separately, the economic impact

---

**1.** Mr. Mulle's income has risen substantially since the original award, thus justifying this review under T.C.A. § 36–5–101(a), which permits a change in child support only "upon a showing of a substantial and material change of circumstances." Whereas his income when the first award was made was approximately $30,-000.00 annually, his gross annual income has risen considerably. In 1988 his gross income was approximately $192,000.00; in 1989, he earned approximately $292,000.00; and in 1990, his income was approximately $260,000.00. These figures contrast with Ms. Nash's 1989 gross annual income of approximately $42,-000.00. In its calculation under the guidelines,

the Juvenile Court increased Mulle's payments to reflect a more appropriate contribution in light of his present earnings.

**2.** Under 42 U.S.C. §§ 651, 652, and 654, a "state plan" is essential in order to assure the state's receipt of federal money for child support enforcement. 42 U.S.C. § 667(a) requires that "[e]ach state, as a condition for having its State plan approved ..., must establish guidelines for child support award amounts within the state."

**3.** Tenn.Comp.R. and Regs. ch. 1240–2–4–.01(6) (1989).

on the child(ren) is minimized and to the extent that either parent enjoys a higher standard of living, the child(ren) share(s) in that higher standard." Tenn.Comp.R. and Regs. ch. 1240–2–4–.02(2)(e). This goal becomes significant when, as here, one parent has vastly greater financial resources than the other. It reminds us that Tennessee does not define a child's needs literally, but rather requires an award to reflect both parents' financial circumstances. This goal is consistent with our long-established common law rule, which requires that a parent must provide support "in a manner commensurate with his means and station in life." *Evans v. Evans*, 125 Tenn. 112, 119, 140 S.W. 745, 747 (1911).

The guidelines are currently structured to require payment by the non-custodial parent of a certain percentage of his or her net income, depending upon the number of children covered by the support order (21 percent for one child, 32 percent for two children, etc.). The statute promulgating the use of the guidelines creates a "rebuttable presumption" that the scheduled percentages will produce the appropriate amounts to be awarded as monthly child support.[4] However, they are subject to deviation upward or downward when the assumptions on which they are based do not pertain to a particular situation. For example, one assumption on which the percentages are based is that the "children are living primarily with one parent but stay overnight with the other parent as often as every other weekend . . ., two weeks in the summer and two weeks during holidays. . . ."[5] The criteria for deviation provide that when this level of visitation does not occur, child support should be adjusted upward to provide for the additional support required of the custodial parent.[6] Additionally, "[e]xtraordinary educational expenses and extraordinary medical expenses not covered by insurance" are given as reasons for deviation.[7] The guidelines thus recognize that "unique case circumstances will require a court determination on a case-by-case basis."[8]

Among the "unique cases" specifically anticipated in the guidelines are those cases in which the income of the parent paying support exceeds $6,250.00 per month.[9] In the criteria for deviation the guidelines provide that among the "cases where guidelines are neither appropriate nor equitable" are those in which "the net income of the obligor exceeds $6,250 per month."[10] In the present case, the Juvenile Court calculated Charles Mulle's net monthly income to be $14,726.98, a figure well above the $6,250.00 figure justifying deviation from the guidelines. Yet the total award of $3,092 ordered by the trial judge is exactly 21 percent of Mulle's monthly income.

Obviously, to treat the monthly income figure of $6,250.00 as a cap and automatically to limit the award to 21 percent of that amount for a child whose non-custodial parent makes over $6,250.00 may be "neither appropriate nor equitable." Such an automatic limit fails to take into consideration the extremely high standard of living of a parent such as Charles Mulle, and thus fails to reflect one of the primary goals of the guidelines, *i.e.*, to allow the child of a well-to-do parent to share in that very high standard of living. On the other hand, automatic application of the 21 percent multiplier to every dollar in excess of $6,250.00 would be equally unfair.

■ We conclude that the courts below found themselves at such polar extremes in this case due to a misreading of the criteria for deviation in the guidelines. The Juvenile Court placed the burden "on Mr. Mulle to convince the Court of the inequity or inappropriateness of the guidelines in this case," *i.e.*, to prove that the court should award less than 21 percent of his income in

4. T.C.A. § 36–5–101(a)(2); Tenn.Comp.R. & Regs, ch. 1240–2–4–.02(8).

5. Tenn.Comp.R. & Regs, ch. 1240–2–4–.02(7).

6. Tenn.Comp.R. & Regs., ch. 1240–2–4–.04(b).

7. Tenn.Comp.R. & Regs., ch. 1240–2–4–.02(6).

8. Tenn.Comp.R. & Regs., ch. 1240–2–4–.02(5).

9. Tenn.Comp.R. & Regs., ch. 1240–2–4–.04(5).

10. Tenn.Comp.R. & Regs., ch. 1240–2–4–.04(2)(a).

excess of $6,250.00. That court ultimately found that Mulle had shown no "extraordinary burden" on his budget or other reason justifying deviation downward from the presumptive award of 21 percent, and awarded that amount. The Court of Appeals, on the other hand, held that "to obtain support larger than 21% of $6,250.00 for one child, the [custodial parent] has the burden of showing such need." Thus, to receive more than $1,312.00 per month for the child, Helen Nash would have to demonstrate exactly why the additional money was required. Rather than adopting either of these diametrically opposed approaches, we conclude that the trial court should retain the discretion to determine—as the guidelines provide, "on a case-by-case basis"—the appropriate amount of child support to be paid when an obligor's net income exceeds $6,250.00 per month, balancing both the child's need and the parents' means.

The guidelines' very latitude reflects this need for an exercise of discretion. Twenty-one percent of an enormous monthly income may provide far more money than most reasonable, wealthy parents would allot for the support of one child. However, it would also be unfair to require a custodial parent to prove a specific need before the court will increase an award beyond $1,312.00. At such high income levels, parents are unlikely to be able to "itemize" the cost of living. Moreover, most parents living within their means would not be able to present lists of expenditures made in the mere anticipation of more child support. Until the guidelines more specifically address support awards for the children of high-income parents, we are content to rely on the judgment of the trial courts within the bounds provided them by those guidelines. In this case, although the child support award may be appropriate, we think it expedient to remand this case to the Juvenile Court, thus providing the trial judge an opportunity to reconsider his opinion in light of the fact that he is not limited to the $1,312.00 cap imposed by the Court of Appeals, nor is he bound to award 21 percent of Charles Mulle's full net income, but may exercise his discretion as the facts warrant.

## II.

As he did before the Court of Appeals, Charles Mulle contends that the establishment of an educational trust fund for his daughter unlawfully requires him to support her past her minority. Citing *Garey v. Garey*, 482 S.W.2d 133 (Tenn.1972), and *Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn.1973), he argues that the trust fund is incompatible with Tennessee case law. In *Garey*, this Court held that "[b]y lowering the age of majority from 21 to 18 years of age the Legislature has completely emancipated the minor from the control of the parents and relieved the parents of their attendant legal duty to support the child." 482 S.W.2d at 135. Because the trust fund is intended for Melissa's college education, her father insists that it unlawfully requires post-minority support.

We conclude, to the contrary, that the establishment of the trust fund in this case does not conflict with the holding in *Garey*. Although child support payments may not extend beyond the child's minority (except in extraordinary circumstances involving physical or mental disability), the benefits from such payments can. Hence, it is consistent with established rules of Tennessee law to hold, as we do here, that funds ordered to be accumulated during a child's minority that are in excess of the amount needed to supply basic support may be used to the child's advantage past the age of minority.

In reaching this conclusion, we must recognize the obvious fact that responsible parents earning high incomes set aside money for their children's future benefit and often create trusts for that purpose. They save for unforeseen emergencies; they accumulate savings for trips and other luxuries; and they may, and usually do, save for their children's college educations. Melissa's mother has expressed her intention to send her daughter to college. As all parents realize, however, the goal of sending a child to college often requires the wise management of money through savings. For a child of Melissa's age, assumed to begin college in the fall of 2000, it has been estimated that a parent must in-

vest $457.00 per month for a public college education, or $964.00 per month for a private education, in order to save the $61,571.00 or $129,893.00, respectively, that will be required to fund a college education beginning that year.[11] Lacking the resources to write a check for the full amount of college tuition, room, board, and other expenses when that time arrives, Helen Nash must accumulate these savings over the course of the child's minority, or be forced to borrow the money later on. Such savings in this case would inevitably deplete Melissa's child support award. While in many cases parents undergo serious financial sacrifices to make college possible for their children, in this case, as the Juvenile Court found, Charles Mulle's income can afford Melissa a high standard of living that also includes savings for college.

We believe that an approach that refuses to recognize the laudable goal of post-secondary education and instead provides only for the child's immediate needs, would not be a responsible approach. If the most concerned, caring parents do not operate in such a haphazard way, surely the courts cannot be expected to award child support in such a fashion. Thus, we conclude that establishing a program of savings for a college education is a proper element of child support when, as in this case, the resources of the non-custodial parent can provide the necessary funds without hardship to that parent.

Moreover, the use of a trust fund for just such a purpose is explicitly approved by the guidelines. In the section on criteria for deviation, the guidelines provide:

There are ... cases where guidelines are neither appropriate nor equitable when a court so finds. Guidelines are inappropriate in cases including but not limited to, the following: (a) In cases where the net income of the obligor ... exceeds $6,250 per month. *These cases may require such things as the establishment of educational or other trust funds* for the benefit of the child(ren) or other provisions as may be determined by the court.

Tenn.Comp.R. & Regs., ch. 1240–2–4–.04(2)(a) (emphasis added). Thus, the guidelines specifically recommend a trust fund in cases in which a large cash award may be inappropriate. Moreover, the guidelines do not limit expenditures from such trusts to the child's minority. We defer to the policy judgment of the legislature in adopting the guidelines and uphold the use of the trust in this case.

In addition to adhering to the guidelines and providing a mechanism for this laudable use of savings, a trust fund for college education achieves several other goals. First, in a case such as this one involving a large difference in the parents' incomes, the trust allows for equitable contributions from each parent while avoiding an immediate cash windfall to one of them. When a large award given to a custodial parent with a much lower income would result in a windfall to the custodial parent, a trust fund helps to ensure that money earmarked for the child actually inures to the child's benefit. Thus, the trust fund is properly used to minimize unintended benefits to the custodial parent.

We also note the need for a trust as protection for the child of an uncaring non-custodial parent. When the Supreme Court of Washington upheld an order requiring a parent to fund the college education of his three sons, it noted "the long standing special powers the courts have had (in equity, regardless of legislation) over the children of broken homes to assure that their disadvantages are minimized." *Childers v. Childers*, 89 Wash.2d 592, 575 P.2d 201, 207 (1978). Later, quoting *Esteb v. Esteb*, 138 Wash. 174, 184, 244 P. 264, 267 (1926), the *Childers* court continued, "Parents, when deprived of the custody of their children very often refuse to do for such children what natural instinct would ordinarily prompt them to do." 575 P.2d at 208. When a non-custodial parent has shown normal parental concern for a child, a trust fund may be unnecessary to ensure that his or her feelings are reflected in spending. However, when a non-custodial parent shows a lack of care, the court

---

11. *See The Tennessean,* Nov. 14, 1992, at 1E, col. 4.

may step in and require the parent to support his or her child. The establishment of a trust is simply one discretionary mechanism used in the endeavor.

█ Thus, Charles Mulle's argument that the absence of a relationship with Melissa obviates the need to fund her college education is simply backwards. Child support is designed to prevent a non-custodial parent from shirking responsibility for the child he or she willingly conceived. It is precisely when natural feelings of care and concern are absent, and no parent-child relationship has been developed, that the court must award child support in a manner that best mirrors what an appropriate contribution from an interested parent would be. In fact, at least one court has gone beyond the acknowledgment of this lack of parental interest, and has spoken in terms of compensating the child for the parent's lack of concern. In *Cohen v. Cohen*, 193 Misc. 106, 82 N.Y.S.2d 513, 514 (1948), the court stated that the non-custodial parent "should be obliged to make up for his neglect, and to contribute towards his son's education as much as lies within his power." While we do not adhere to this compensatory view of child support, we do believe that an appropriate child support award should reflect an amount that would normally be spent by a concerned parent of similar resources.

We thus find no merit to Charles Mulle's complaint that the order deprives him of the freedom to decide his daughter's educational fate, arguing that a requirement is being imposed upon him that does not exist for married parents. He contends in his brief that "some parents plan for the future education of their children and some do not"; he argues that "[s]urely a divorce decree or a paternity order should not give children rights that children who are living with their parents who are married do not have." This argument overlooks the obvious fact that divorced and unmarried parents face a substantial loss of parental autonomy whenever a court must step in to exercise responsibility for their children in the absence of parental cooperation. Married parents may choose to rear their children in an extravagant or miserly fashion; they may send their children to expensive private schools and universities; or they may require their children to make their ways in the world at age 18. Nevertheless, when children become the subject of litigation, courts must judge the children's needs. Long-standing Tennessee law requires the courts to evaluate children's needs not in terms of life's essentials, but in terms of the parents' "means and station in life." *See Atchley v. Atchley*, 29 Tenn. App. 124, 127, 194 S.W.2d 252, 253 (1945) (citing *Evans v. Evans, supra*, 140 S.W. at 747). The guidelines' requirement that child support allow a child to share in the higher standard of living of a high-income parent continues this objective. Tenn. Comp.R. & Regs., ch. 1240–2–4–.02(2)(e). Thus, Mulle's complaint about the alleged unfairness of the court's judgment concerning the benefits his standard of living should afford Melissa is misplaced.

Moreover, as the court stated in *Atchley*, "[r]eason, as well as the public policy of this state, favorable as it is to higher learning, permits no other conclusion. The high esteem in which college training is held in this state is unmistakably indicated by the numerous colleges found in the various parts of this state." 29 Tenn.App. at 129, 194 S.W.2d at 254 (citing *Jackman v. Short*, 165 Or. 626, 109 P.2d 860 (1941)). When the Illinois court in *Maitzen v. Maitzen*, 24 Ill.App.2d 32, 163 N.E.2d 840, 845 (1959), required a parent to provide a college education to a child over the age of majority in the absence of legislative approval, it stated in a similar vein:

> The public policy of this state, that a college education be given children whenever possible, is evidenced by the many institutions of higher education maintained by the state.... A divorced parent should not ... expect his children to rely on the bounty of others when he has ample means to provide for them.

*Id.*, 163 N.E.2d at 845 (citing state and federal college aid statutes). The Washington Supreme Court likewise reasoned in *Childers*, saying, "[The fact that] it is the public policy of the state that a college education should be had, if possible, by all its citizens, is made manifest by the fact that the state of Washington maintains so

many institutions of higher learning at public expense." *Id.* 575 P.2d at 206. Given the public policy favoring higher education in Tennessee, likewise evidenced by our many colleges and universities, it would be highly improper in this case to cast the burden of Melissa's higher education entirely on her mother, or on the "bounty of the state," when her father can provide for her education without unduly burdening himself.

In ruling the trust in this case illegal because it "has no relation to the support of the child during minority," the Court of Appeals relied for authority on prior Tennessee case law discussed earlier in this section, as well as cases from other jurisdictions, primarily Illinois and Hawaii. But, the Tennessee precedents predate the enactment of the Child Support Guidelines, which specifically authorize the use of trusts in cases involving non-custodial parents with high income, without limiting expenditures to the beneficiary's minority. Moreover the courts and legislatures of many other states have approved the funding of a college education by non-custodial parents who can afford such an expense. Indeed, several courts have done so without explicit statutory permission. In Pennsylvania, for example, the rule that a parent owes no duty of support for a child's college education is subject to an important exception. A parent may be ordered to provide such support if that parent has the "earning capacity or income to enable him to do so without undue hardship to himself." *See Commonwealth v. Thomas,* 243 Pa.Super. 599, 364 A.2d 410, 411 (1976); *see also Brake v. Brake,* 271 Pa.Super. 314, 413 A.2d 422 (1979). Therefore, in appropriate cases, the Pennsylvania courts require college support, even though the age of majority in that jurisdiction is 18.[12] An Alabama court, similarly, has required the establishment of a trust during a child's minority for educational expenses incurred after the age of majority. *See Armstrong v. Armstrong,* 391 So.2d 124, 126 (Ala.Civ. App.1980). The Iowa Supreme Court de-

creed in *Hart v. Hart,* 239 Iowa 142, 30 N.W.2d 748 (1948), that a non-custodial parent should provide his sons with four-year college educations despite the fact that college funding would likely require support beyond the 21-year-old age of majority in existence at that time.[13] New Hampshire courts also have the discretion to award college support past the age of majority. *See Gnirk v. Gnirk,* 134 N.H. 199, 589 A.2d 1008, 1011–12 (1991). These courts have used their equitable powers to require wealthy non-custodial parents to fund their children's college educations past the age of majority.

In yet other states, the authority of the courts to require non-custodial parents to fund a college education for their children is provided by statute. In Washington, after the child support statute was amended to include support for "dependents," the Washington Supreme Court declared that a college education could be included in the duty of support in cases where it "works the parent no significant hardship and ... the child shows aptitude." *Childers v. Childers, supra,* 575 P.2d at 207. Oregon, similarly, allows courts to award support to children until the age of 21, three years past the age of majority, if they attend school. *See* Or.Rev.Stat. § 107.108 (1991); *In the Matter of the Marriage of Wiebe,* 113 Or.App. 535, 537, 833 P.2d 333, 334 (1992). Indiana allows child support for college expenses if the parent has the financial ability and the child has the aptitude. Ind.Code § 31–1–11.5–12(b) (1991); *see also Martin v. Martin,* 495 N.E.2d 523 (Ind.1986).

Other legislatures have taken the lead from court decisions allowing college support and now statutorily provide for such support. For example, Illinois has codified prior case law that had established a parent's duty to provide for his or her child's education whether the child was of minority or majority age. Ill.Ann.Stat. ch. 40, para. 513 (Smith–Hurd (1980)) (codifying *Maitzen v. Maitzen,* 24 Ill.App.2d 32, 163

---

**12.** 23 Pa.Cons.Stat.Ann. § 4321.

**13.** Iowa Code § 599.1 (1981) now makes the age of majority 18. In 1972 the age was reduced to

19 from 21, and a year later the age was reduced again to 18 (see historical notes).

N.E.2d 840 (1959)). *See also Greiman v. Friedman,* 90 Ill.App.3d 941, 46 Ill.Dec. 355, 414 N.E.2d 77, 80–1 (1980). In addition, a New York statute permits an award for post-secondary educational expenses when the court determines that the award is appropriate in light of "the circumstances of the case and of the respective parties and the best interests of the child and as justice requires." N.Y.Jud.Law § 413(1)(c)(7) (McKinney 1992). New York's statute replaces years of case law holding that a college education could be a "special circumstance" meriting support past minority. *See Gamble v. Gamble,* 71 A.D.2d 649, 418 N.Y.S.2d 800 (1979); *Brundage v. Brundage,* 100 A.D.2d 887, 889, 474 N.Y.S.2d 546, 549 (1984); *Shapiro v. Shapiro,* 116 Misc.2d 40, 45, 455 N.Y.S.2d 157, 160–61 (1982). Thus, whether based on statute or rooted in the courts' equitable powers in family matters, the efforts of these states to provide for the college educations of children with wealthy parents persuade us that reason and public policy permit the use of a trust fund in this case.

In light of the guidelines' explicit provision for the use of trusts in cases involving high-income parents, the goals promoted by the use of a trust in this instance, and the reasoned support of other state courts and legislatures, we find the use of an educational trust in this case to be proper. As noted in Section I, however, there remains the question of the level at which the trust should be funded in this case. We therefore reverse the judgment of the Court of Appeals, and remand the case to the Juvenile Court for calculation of an award in accordance with this opinion.

Finally, we grant the appellant her attorney's fees and all other costs of the appeal, pursuant to T.C.A. § 36–5–101(i).

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.