687 So.2d 338 (1997)
Geri E. FINLEY, Appellant/Cross-Appellee,
v.
Dennis SCOTT, Appellee/Cross-Appellant.
No. 95-308.
District Court of Appeal of Florida, Fifth District.
February 7, 1997.
*339 Jane E. Carey and Harry H. Morall, II, of Morall & Carey, Orlando, for Appellant/Cross-Appellee.
Michael R. Walsh, Orlando, for Appellee/Cross-Appellant.

EN BANC
HARRIS, Judge.
We elect to hear this case en banc.
The issue before us is not whether the father should pay support for his child. Indeed, Mr. Scott has acted responsibly by acknowledging this obligation and paying support since the child was born. And the issue is not the amount of support that should be paid in order for the child to enjoy the appropriate standard of living. The trial court has determined that $2,000 is the amount of the "monthly living expenses of the minor child" and the father does not challenge that figure. The issue in this case is whether, because of dictum in Miller v. Schou, 616 So.2d 436 (Fla.1993), Florida has become a support-plus state. In other words, are parents in Florida not only required to meet the day-to-day expenses necessary to maintain their children in the standard of living determined to be appropriate by the custodial parent but also to contribute a portion of their income into a trust account or guardianship account in order to meet the future but unspecified needs or wants of their children?
This case requires that we determine, under existing law, what the parental obligation is for child support when there is more money available than is required to meet the current needs of the child based on the actual standard of living found to be appropriate by the custodial parent. Before guidelines and before Schou, our task would have been easy. The support would be set to meet the current needs of the child, taking into account the ability of the parent to meet those needs. See, e.g., Davis v. Davis, 371 So.2d 591 (Fla. 2d DCA 1979). Since ability to provide the appropriate support is not in question in our case, under the old rule the total expenses required to meet the child's needs consistent with an appropriate standard would determine the support required from the paying parent. The mother now urges that a different rule applies.
In Schou, the supreme court declared that the child is entitled to "share in the good fortune" of the parent. Admittedly this statement is subject to interpretation. The mother contends that under this principle, and under section 61.30, Florida Statutes, as amended in 1993, she (on behalf of the child) is entitled to 5% of the father's income over $10,000 per month regardless of her actual expenses in raising the child. She contends that the "child support" statute and Schou mandate a forced transfer of 5% of the father's income to or on behalf of the child regardless of the child's needs. But we must decide if parents literally have this obligation to share their estate with their children in this fashion. If the obligation exists, does it automatically end when the children turn *340 eighteen? If so, why? And do only the children of unwed or divorced parents have this "right" to share in their parent's estate or should we expect a flood of "next friend" cases against affluent but less indulgent married parents?
One court seems to agree with the mother's contention, at least in part. In Boyt v. Romanow, 664 So.2d 995 (Fla. 2d DCA 1995), the court recognized a "good fortune" award of child support. This was defined as the difference between the child support guidelines amount and the actual amount determined by the court to meet the child's needs. The court determined that this "good fortune" award should be placed in a trust account to be administered by a guardian ad litem for the child's future but unspecified use. Boyt cites Schou as authority for awarding excess child support (a good fortune award) in this manner. We do not read that intent into Schou. The issue in Schou was whether the father, who admitted that he had ample ability to meet an increased award of child support, should nevertheless be required to disclose his financial position. The court ruled in the affirmative holding that unless the court knew the specifics of the father's income, it could not determine the appropriate standard of living to apply to the modification of the child support obligation. The Schou court stated:
While technically the child's basic survival needs would be the same [regardless of the parents' income], the determination of "need" in awarding child support takes into account more than just the basic necessities of survival. [Citation omitted]. The child of a multimillionaire would be entitled to share in that standard of livingfor example to attend private school or to participate in expensive extracurricular activitiesand would accordingly be entitled to a greater award of child support to provide for these items, even though provisions for such items would not be ordered in a different case.
Schou, 616 So.2d at 438 (emphasis added).
Schou simply did not contemplate a child support "slush fund." In Schou, the supreme court merely required that the child support increase sought by the custodial parent be determined consistent with the standard of living appropriate to the parents' income. Although the Schou court observed "that the need of the child is only one of several factors to be considered in determining an appropriate amount of support", it did not suggest that support should be need-free. Id. at 438. For example, if a child "needed" a car, the type of car provided might depend on the parent's income. Schou does not suggest that a car must be provided to a twenty-two month old child even if the father has ample income. A "share in the good fortune" does not equate with a "share in the estate." There is no indication that the supreme court contemplated that a certain percentage of the parents' income would be set aside for support even if such amount was not reasonably needed to meet the child's expenses as determined by the custodial parent.
There is apparent disagreement as to who should choose the family's standard of livingthe judge (or panel of judges) or the parents. We conclude, unless the child is being deprived of necessities, that the proper decision maker in this regard is the custodial parent (or both parents if they can work together) and not the court. If the custodial parent refuses to meet the child's basic needs, then a change of custody should be considered. We believe that setting the appropriate standard of living for one's family should be left to that family because although the amount of finances available may influence, even limit, the standard of living chosen, many parents use factors other than finances to determine the standard appropriate for their family. Factors such as family priorities, family values, experience, and tradition may be more important to some families than merely the amount of money available. Consideration of the child's ability, interests and personality may also influence that decision more than financial considerations.
Few (but almost certainly some) would suggest that an affluent married couple living together who decide to send their child to a public school instead of an expensive private school and who buy their child a used vehicle instead of a new convertible when he or she *341 turns sixteen should be required to put the money saved by these decisions into a trust account for their child. Why then should a divorced parent or a parent of a child born out of wedlock be required to advance funds for a private education or a new convertible when such expenses are not being sought and may never be sought by the custodial parent? That is the result of the court's action when, on its own, the court determines that the standard of living chosen by the parents or custodial parent is inadequate merely because the paying parent has the ability to pay more.
A "good parent" has been described as one who provides for all of the needs but only some of the wants of his children. This definition recognizes that once a parent meets the needs of the child (consistent with the parent's chosen life-style), the good parent uses further rewards to encourage industry, good deportment and proper attitude. This extremely important parental option is lost if the court decrees that a child is entitled to his share of the family wealth and will get it in spite of the parent's desire. In this vein, we interpret Schou as merely recognizing that the actual, current needs of the child should be determined on the basis of an appropriate standard of living. In other words, money for a private school could be provided if the parent intends to send the child to private school; tutors should be provided if the child needs a tutor and if the custodial parent is willing to employ one; a contribution to the cost of living in a better area if the custodial parent is willing to relocate might be factored into the support. But in any event, the support should be set in an amount that meets the actual, current living expenses of the child. There appears to be no rational justification, other than estate sharing, for requiring a parent to pay for a private education if the child is sent to a public school or for a tutor if one is not needed or desired or for a contribution for relocation if the custodial parent will not move merely so that the child or custodial parent can bank the difference.
The foregoing analysis brings us to the facts of this case. Under the guidelines as amended in 1993, the father would be required to pay $120,000 a year ($10,000 per month) for the support of one child. The judge, after considering the amount claimed in the mother's initial affidavit in the amount of $2,128 per month, which sum also included expenses for the mother and other children, and after rejecting a new figure in the amount of $5,173 (which still included the expenses of the mother and other children) submitted by the mother just prior to the final hearing because the court found such expenses to be either "exaggerated, misleading, false, non-existent, or inaccurate," found that the amount of child support required to meet the day-to-day living expenses consistent with the standard of living chosen by the mother was $2,000 per month and ordered this amount paid directly to her. This award is supported by the record. But instead of stopping here, the judge, probably influenced by Boyt and by the dictum in Schou, awarded an additional "good fortune" sum in the amount of $3,000 to be paid directly to an independent guardian and not earmarked for the day-to-day use of the child. Even if it is appropriate for judges to impose a standard of living on parents, may they do it from whole cloth? The mother in this case strained mightily, and with the assistance of able counsel, and could only justify a figure of $2,000 per month, $24,000 per year, to support a single child. If one considers that this child is a twenty-two month old toddler, is that so difficult to understand? If the court is nevertheless going to impose this grandiose standard of living, should it not at least direct the mother as to how she will spend the money?
The trial court did recognize the unreasonableness of a mechanical application of the guideline tables and reduced the total support obligation to $60,000 per year ($5,000 per month)still two and one-half times the amount determined to meet the yearly current needs of the childand ordered that the "good fortune" portion be set aside for future, unspecified uses. The court does not explain how this increased award relates to the child's needs or the child's standard of living and does not indicate how the additional amount is justified by the evidence in this case.
*342 The trial court did make the statement in its Final Judgment that the $5,000 sum is "consistent with the actual and bona fide needs of the minor child" but did not pretend that there was record justification for such finding. The trial court, in its Final Judgment, admits that there is no supporting evidence for this figure when it holds:
3. That as to the issue of child support, this Court has determined that the amount of child support to be awarded shall be less than and, therefore, varies with, the child support guidelines imposed by F.S. 61.30(6) and, more particularly, the percentage multiplied by the combined parental income of the parents which exceeds $10,000 per month. The Court will not impose the guideline amount suggested by the Petitioner in the amount of $10,011 per month but will rather award $5,000 per month as child support because this amount is a more reasonable adjustment and, therefore, achieves a more equitable result, F.S. 61.30(11)(k). (Emphasis added).
While we agree that $5,000 is a "more reasonable" monthly figure and thus more "equitable" than the $10,000 figure, unless it is tied to some evidence in the record, it remains merely a reduced "good fortune" award. It still has no relationship to the child's actual needs. It is merely a judicial compromise that can only be justified if we hold that need is no longer relevant to the concept of child support and then is only justified because it falls within the limits of the legislative child support guidelines. But if a child's needs are no longer relevant to the award of child support and we are to be guided only by the parents' income, by what authority did the trial judge in this case reduce the statutory $10,000 award? We agree with Ms. Finley that if need is irrelevant, the court erred in reducing her award.
On this appeal, the father questions what authority justifies requiring him to pay as "child support" any sum greater than that needed to meet the current expenses of his child. The mother, on the other hand, questions on what authority the court reduced the guideline award and, in addition, put part of that amount into a guardianship account. These issues require that we face the ultimate question of whether the legislature, by enacting section 61.30, Florida Statutes, intended to remove need from judicial consideration in setting child support. We think it did not. We believe that the guidelines incorporate a "presumed need" which, if not challenged, justifies the figure established by the tables as determined by the parents' income. Section 61.30(6) provides: "The following schedules shall be applied to the combined net income to determine the minimum child support need." (Emphasis added). Therefore, depending on the parents' income, a presumptive need is determined from the schedules. The question then becomes whether the need thus determined is rebuttable. We believe it is. For example, the court may determine a greater need if there are extraordinary expenses [section 61.30(11)(a) ] and may determine a lesser need if the child has independent income [section 61.30(11)(b) ]. Further, there is a catch-all provision [section 61.30(11)(k) ] which permits "any other adjustment" in order to achieve an equitable result. These provisions show that the need determined by the child support schedules is not written in stone.
If we are correct, however, and the guidelines do establish merely a rebuttable presumption of the child's need, since the father has challenged the award as being excessive we would expect him to have the burden of proof even though all of the records appear to be in the possession of the mother. The father attempted to meet that burden. The trial court specifically found that the mother refused to account for past child support payments; refused to produce records of expenses of the child even though ordered by the court to do so; failed to bring to court documents specifically requested by a Notice to Produce; and was "inaccurate, evasive, incomplete, and misleading" in her attempted compliance with a court order to produce summaries of her checkbook and cash expenditures. Under the circumstances of this case, we conclude that the father met his burden and that the financial affidavits in the record are sufficient to prove the $3,000 per month award required to be paid to the *343 guardian is excessive support and unwarranted.
A case involving a large but somewhat less dramatic amount of income was considered by the court in Dyas v. Dyas, 683 So.2d 971, (Ala.Civ.App.1995), affirmed, 683 So.2d 974, (Ala.1996):
When the combined adjusted gross income exceeds the uppermost limits of the child support schedule, the amount of child support awarded must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce ... and must reasonably relate to the obligor's ability to pay for those needs.... To avoid a finding of an abuse of discretion on appeal, a trial court's judgment of child support must satisfy both prongs.
In this case, the amount awarded totally fails on the first prong; it is abundantly clear from the record that the child support awarded was based solely on the husband's perceived ability to pay and does not rationally relate to the reasonable and necessary needs of the two minor children.
The father in this case, at least inferentially, asks why it is that the children of a divorced parent or an unwed parent are entitled to a trust or guardianship fund when the children of married parents have no similar rights. Are married parents, at law, presumed to be so much more responsible than their unmarried or divorced counterparts that they will automatically provide adequately for their children? Assuming no modification in this case, the child will have a trust account of about a half million dollars (not including accumulating interest) when she reaches eighteen. Why should not the children of married couples with high incomes have this same right to a trust account? We have said that no parent, married or divorced, has an obligation at law to send his or her child to college. See Keenan v. Keenan, 440 So.2d 642 (Fla. 5th DCA 1983). Are we changing this rule as it applies to divorced or unwed parents by requiring them to contribute monthly to a trust account during the minority of their children? In Grapin v. Grapin, 450 So.2d 853 (Fla.1984), the Florida Supreme Court held that to require a divorced parent to send his or her child to college without requiring married parents also to do so would be a denial of equal protection under the law. Further, under Grapin, this equal protection concern could not be circumvented by indirection by increasing the amount of alimony in order to permit the other parent to send the child to college. Can it be circumvented by requiring that only unwed or divorced parents must set up "good fortune" trust accounts for their children's future (college) needs?
A parent's high income should only be considered by the court in determining the standard of living that the child should enjoy, and only in that manner should it influence the level of support. Other than Boyt, there appears to be no authority for requiring that a parent's estate be "shared with the child" in the form of contributions into a trust account. The state is empowered, even obligated, to require parents to appropriately provide for their children; however, any state-mandated payment in excess of the amount required to meet this parental obligation exceeds any child support justification. Current law does not appear to authorize a "good fortune" award separate and distinct from adequate child support which maintains the child in the appropriate standard of living.
Some suggest that a possible justification for this "excess" award is that because of the mother's circumstances, even with child support, she would be unable to provide the child with the lifestyle that the father could if he had custody. This reasoning would justify the award of excess child support in order to give the child a deferred standard of living which the child can enjoy when she is on her own. This points out the problem inherent in custody cases, particularly those involving out of wedlock children, that since the father has no obligation to support the mother the child's standard of living must necessarily be influenced by the circumstances of the custodial parent. The problem is great; the solution is obscure. While this solution may be appealing, it is not "child support." As the *344 court observed in Richardson v. Richardson, 8 Haw.App. 446, 808 P.2d 1279, 1286 (1991):
In Doe VI v. Roe VI, 6 Haw.App. 629, 736 P.2d 448 (1987), which is a pre-child support guidelines case, we stated that "an award of child support is for the child's current needs based on the child's appropriate standard of living and not for the purpose of saving portions thereof for future needs." [Citation omitted]. In other words, a payment in excess of the children's reasonable needs at the appropriate standard of living is, by definition, a payment for something other than child support.
While we agree that under the appropriate circumstances, such as when the mother squanders the support intended for the benefit of the child, the court may require an accounting or place the money under the control of another, we hold that the award should be limited to the amount needed to currently support the child in the appropriate standard of living and not to provide a fund for future, unspecified uses. As the child's needs increase, and they might very well increase, the legislature has provided a remedy often used. It is called a "modification" and the procedure is set out in section 61.14, Florida Statutes. As a matter of fact, the Schou opinion resulted from a modification action. A "fund" should not be substituted for this procedure.
We acknowledge conflict with Boyt.
REVERSED AND REMANDED for further action consistent with this opinion.
PETERSON, C.J., and COBB and THOMPSON, JJ., concur.
DAUKSCH and ANTOON, JJ., concur and concur specially, with opinion.
W. SHARP, J., dissents, with opinion in which GOSHORN, J., concurs.
GOSHORN, J., dissents, with opinion in which W. SHARP and GRIFFIN, JJ., concur.
GRIFFIN, J., dissents, with opinion in which GOSHORN, J., concurs.
DAUKSCH, Judge, concurring specially.
While I concur with the majority, I disagree with the decision of this court not to certify the question in this case to our supreme court for an early resolution. The existing case law demonstrates a lack of compatibility among the district courts on this child support issue. Until our supreme court speaks definitively on the subject, conflict will fester amongst the courts.
The question in this case is a policy question, not a purely legal question, or even a fairness question. The trial judge provided for the child's support and it is clear that the father has been more than supportive and fair with his child. The question then, is how much must the state, through the courts, insert itself into the lives of the father, the mother and the child to mandate what the child gets, over and above her support, of her father's estate? What protections must the state afford for the father and the child if the father's money is given to the mother? What rationale will be given to justify requiring a father who is not married to the mother to raise his child in some fashion other than what would be done if the father and the mother were married?
Courts of appeal do not set statewide policy; only the supreme court should do that. I would certify the questions in this case to the supreme court as being of great public importance.
ANTOON, Judge, concurring specially.
I concur. The purpose of child support is to ensure that the needs of children who are not residing with their parents are met. Without question, these children should share in the good fortune of their parents. To this end, support should be set at a level to minimize the change in a child's life-style when her parents decide to separate. And children born out of wedlock also should benefit from their parents' financial security through awards of child support which take into consideration the parents' earning ability.
In the instant case, Mr. Scott's earning power is extraordinary. It is obvious that he could meet any conceivable material need his daughter might have. He certainly has the *345 ability to pay for any medical, educational, recreational or special needs that the child may have in the future. The trial court, however, found that the current needs of his 24-month-old toddler are met by an award of $24,000 per year child support. Notwithstanding this finding, the trial court awarded an additional $3,000 per month to be paid to an unrelated professional guardian to be used should the child have needs in the future. If such needs do not arise, the funds ostensibly will be distributed to the child upon her attaining majority.
In addition to the legal arguments addressed by the majority, I think the policy of establishing a guardianship to receive child support payments for the future benefit of the child is a mistake. In my view, absent some proof of dereliction of the parents' obligation to meet the child's needs, parental responsibilities should not be turned over to a third person. What kind of message does selecting a stranger to maintain an account for the child send to the responsible parent who wishes to take care of his or her child's needs? Is the answer that we do not trust you or we want to remove you from the responsibility of caring for your child apart from making a monthly deposit? Is it that we do not want you to know what your child's needs are? Why do the trial court and the dissent assume that the guardian will be more responsible than the father in caring for the child? The record before us does not support such a conclusion. In fact, the record demonstrates that Mr. Scott has been very responsible in supporting his daughter without the assistance of a guardian. This responsible behavior is at least an inference that he will continue to answer his daughter's needs in the future.
I understand and respect the dilemma of the trial court and the view of the dissent. There may be cases where the appointment of a guardian is appropriate. But I think this extreme measure should be reserved for those cases where the child's custodian has failed to meet the child's current needs. It should not be used to maintain a savings account to meet the child's future needs, unless there is a showing that the parent will be unwilling or unable to meet such needs. Even then the parent should first be given the opportunity to carry out his or her obligation before resorting to outside interference with the parent/child relationship in the form of a court-appointed guardian.
W. SHARP, Judge, dissenting.
While I concur with Judge Goshorn's opinion in this case, I appreciate the paradox of requiring a parent to overpay "needs and expenses" for a child, as Judge Harris points out in his majority opinion. The difficulty is in part semantical, and in part practical. The crux of the difficulty is settling on whose standard of living determines the "needs" of this child.
In this case, the mother is raising the child on a much lower standard of living than would be established by the father, if the child were living at his current lifestyle of $266,926.00 gross income per month. He could well afford, for example, a full time nanny, housekeepers, international travel, residence in a mansion with high attendant expenses, and transportation in expensive automobiles a portion of which could be allocated to this child. These expenses could easily equate to the $5,000.00 per month found appropriate by the trial court.
However, the mother is not able, in this case, to live at that standard of living. She must provide for herself and her other two children. They cannot benefit from the child support paid for this child, although the mother tried to do so, and has been properly reprimanded by the trial court for that effort. At her standard of living, the trial court found that only $2,000.00 was actually being spent on this child. However, if the father's child support obligations are limited to this level, the child will not share in her father's much higher standard of living and lifestyle. Clearly the "needs" of this child should not be solely based on what the mother can afford to spend on her, consistent with the mother's much lower standard of living. That also would be inequitable.
The only practical solution to this dilemma is to create a trust fund, which will benefit the child in the future and give her a present higher standard living. This is not unlike the practice in some wealthy and moderate-income *346 families, who open savings accounts for children as they are born and fund them periodically with the intent of paying for future needs of such children, be it health related or for a college education. The beneficial interest in such an asset impacts the child's present financial security, as well as her future. Creating such an asset for this child is, as a practical matter, the only way to currently raise the child's standard of living higher than her mother's, without also benefiting the mother and other members of the mother's household who have no right to share in the child's good fortune.
GOSHORN, J., concurs.
GOSHORN, Judge, dissenting.
I do not agree that the trial court determined that $2,000 is the amount of the monthly living expenses of the minor child. The trial judge clearly found that the sum of $5,000 per month is the appropriate amount of support for this child considering the substantial financial resources of the father. I therefore respectfully dissent.

THE FACTS
The mother appeals from a final judgment of paternity which awarded her $5,000 per month child support from the father, to be used for the care of their two year old daughter. The father does not contest paternity. Thus, this appeal only concerns the amount of child support awarded and the manner in which it is to be paid. The trial court refused to award the statutory guideline amount of $10,011, but rather, found that $5,000 was "consistent with the actual and bona fide needs of the minor child and the overall financial circumstances of each parent and will therefore foster and promote an appropriate lifestyle for her." Because the evidence showed that the mother had dissipated part of the child's temporary support, the court awarded $2,000 per month to be paid to the mother and ordered the remainder to be paid to a guardian for the child's benefit. On appeal, the mother argues that the trial court should have awarded the full guideline amount. The father cross appeals, contending that the $3,000 per month ordered paid to the guardian constitutes an abuse of discretion. For the reasons set forth below, I would affirm in part, reverse in part, and remand for further proceedings.
Following the child's birth until the award of temporary support, a period of eleven months, the father, a professional athlete with a gross monthly income of $266,926, voluntarily paid the mother a total of $19,670 to be used to care for their daughter. On September 13, 1994, the mother filed a paternity action against the father and, thereafter, filed a motion for temporary relief. Following a hearing, the trial court entered a temporary order adjudicating paternity, awarding the mother primary residential custody, and ordering the father to pay $5,000 per month in temporary support. The court recognized that this amount was less than the guideline amount pursuant to paragraph 61.30(11)(a), Florida Statutes (1991), but reasoned that it was "a more reasonable adjustment and, therefore, achieves a more equitable result...."
The evidence adduced at the final hearing demonstrated that the mother had not been spending the entire $5,000 per month temporary support money, but rather had saved $12,000 thereof, which she placed in her own bank account. She admittedly used support money for her own benefit. The mother only deposited $438 in earned income into her checking account in 1994, yet had written checks over the course of ten months totaling $7,022.49 to pay her credit card bills. Although she explained that she spent $400 to $500 per month on clothes for the child, she could not reconcile the difference. Additionally, the mother bought a 1993 Ford Explorer, which she admitted was financed by money the father had paid in child support.[1] She also has acquired a cellular phone. While the mother neither goes to school nor works full time, she has hired a full time housekeeper and nanny. The mother testified that she pays the nanny $200 per week whether she comes Monday through Friday or only one day. The mother also admitted that she had *347 paid her mother approximately $1,800 to watch the child.
The court entered final judgment of paternity on January 3, 1995. In its order, the court found that the mother had been less than candid with regard to her past and present employment, her earned monthly income, and her sources of available funds. It also acknowledged that the mother failed to properly account for the $50,000 in temporary child support she had already received from the father. Further, the court found it "equally disturbing" that the mother failed to timely comply with its order on the father's motion to compel production of documents and had refused to bring with her to the trial the financial information requested pursuant to the father's notice to produce. The court stated that the mother's attempt to comply with its previous order by furnishing summaries of checkbook and cash expenditures and savings account withdrawals "constitutes an inaccurate, evasive, incomplete, and misleading explanation of how ... [she] spent the child support entrusted to her." Furthermore, the court faulted the mother for failing to segregate the child's monthly needs rather than lumping all the living expenses for the child, herself, and one other daughter.[2]
In determining child support, the court recognized that paragraph 61.30(1)(a), Florida Statutes permits the court to vary from the guideline amount more than five percent as long as the court gives written reasons for its variance. Therefore, the court specifically declined to impose the guideline amount of $10,011 per month, reasoning that it would be unjust and inappropriate to require the father to pay that sum. Rather, the court awarded $5,000 per month because it represented the child's actual and bona fide needs. This appeal and cross appeal followed.

CHILD SUPPORT AMOUNT
In 1993, the Florida Legislature amended section 61.30 of the Florida Statutes. Ch. 93-208, § 5, at 2069-73, Laws of Fla. Paragraph 61.30(1)(a) permits trial courts to vary from the statutory guidelines by only plus or minus five percent when awarding child support without providing written reasons. If the court wishes to vary further from this five percent allowance, it must make a specific finding to justify the variance. § 61.30(1)(a), Fla. Stat. (1993). Subsection 61.30(6) sets forth the schedule for courts to apply to the combined net monthly income to determine child support need. It then states:
For combined monthly income greater than the amount set out in the above schedules, the obligation shall be the minimum amount of support provided by the guidelines plus the following percentages multiplied by the amount of income over $10,000:

 Child or Children
----------------------------------------------------------------------
One Two Three Four Five Six
----------------------------------------------------------------------
5.0% 7.5% 9.5% 11.0% 12.0% 12.5%

§ 61.30(6), Fla. Stat. (1993).
The mother asserts that the trial court should have awarded her $10,011 per month *348 child support in accordance with the statutory guidelines. She contends that the statutory guidelines are mandatory for those combined monthly incomes greater than $10,000. Alternatively, the mother contends that even if the court had discretion to vary from the guidelines by more than 5 percent, based on the evidence, the father should be obligated to pay the guideline amount because the child is entitled to share in her father's good fortune. Therefore, the mother opines, the court's failure to award her $10,011 per month constitutes an abuse of discretion. I reject the mother's argument that the trial court had no discretion to determine a suitable amount.
Although the child of a multimillionaire is entitled to a greater award than that of the average family, see Miller v. Schou, 616 So.2d 436 (Fla.1993), the trial court is not obligated to approve either unnecessary or extravagant monthly expenditures or those benefitting the custodial parent. See Boyt v. Romanow, 664 So.2d 995, 999 n. 2 (Fla. 2d DCA 1995) (clarifying that courts have the authority to vary by more than 5 percent from the guideline amount to prevent a senseless outcome); see also Miller, 616 So.2d at 439 ("The trier of fact may order payment of child support in an amount which varies more than 5 percent from such guideline amount only upon a written finding on the record, explaining why ordering payment of such guideline amount would be unjust or inappropriate.") (McDonald, J., concurring).
In the present case, I find that the trial court correctly determined that it was not bound to mathematically apply the guideline amount; rather, it properly concluded that paragraph 61.30(1)(a) could be applied to situations such as this where the guideline amount would yield an unintended and unreasonable result. See also § 61.30(11)(k), Fla. Stat. (1993) (stating that "the court may adjust the minimum child support award ... to achieve an equitable result ...").
This conclusion is consistent with holdings in other jurisdictions. In Estevez v. Superior Court (Salley), 22 Cal.App.4th 423, 27 Cal.Rptr.2d 470 (1994), the court recognized that California Family Code section 4056(a) enables the trial court to vary from the guideline formula as long as it states in writing or on the record (1) the guideline amount, (2) the reasons it chose to enter a different amount, and (3) the reasons the amount ordered is in the children's best interests. Estevez, 27 Cal.Rptr.2d at 474. The court explained that, although there exists a rebuttable presumption that the guideline amount should be ordered, a party may rebut the presumption by presenting evidence that "[t]he parent being ordered to pay child support has an extraordinarily high income and the amount determined under the formula would exceed the needs of the children." Id. at 475 (quoting Cal. Fam. Code § 4057(b) (West 1994)). The court noted that applying the guideline to Estevez's income would require him to pay $35,000 per month in child support, and opposing counsel conceded that "such an award would be absurd." Id. at 475 n. 6. See also Richardson v. Richardson, 8 Haw.App. 446, 808 P.2d 1279, 1286-87 (1991) (noting that Hawaii statute permitted deviation from child support guidelines if amount higher than reasonable needs of child would result from high parental income); Archer v. Archer, 813 P.2d 1059, 1061 (Okla.Ct.App.1991) (stating that combined support levels in households with high income should be awarded on a case by case basis).

THE GUARDIANSHIP TRUST
The mother also argues that it was improper for the trial court to establish a guardianship to hold $3,000 of the $5,000 monthly award. She contends that this court should direct that the money be paid to her. The father's cross appeal alleges that the court should not have ordered that the monthly $3,000 payment be placed into a guardian trust, but rather, his monthly support obligation should be reduced by that amount. I disagree with both of these propositions and find that it was within the trial court's discretion to place the money into trust. Nonetheless, I would remand for the court to enter an order explaining the purpose of the fund and how it will be disbursed.
*349 In Boyt, the Second District Court of Appeal recently considered this precise issue and found that the trial court was authorized to establish a guardianship to oversee the amount of child support that exceeded the child's needs. The court reasoned that it "has the inherent power within its sound discretion to safeguard the minor child's well-being for the present and for the future." Boyt, 664 So.2d at 998; see also Irvin v. Seals, 676 So.2d 436 (Fla. 2d DCA 1996) (reaffirming Boyt's approval of guardianship trust) (Parker, J., concurring). The record supports such a trust in the present case. There was evidence that the mother improperly utilized the child support payments on personal luxuries, and on her child from a previous relationship, of which the father had no responsibility or obligation.
The father argues that the creation of such a fund to be supervised by a guardian is tantamount to requiring him to support the child after she reaches majority. The Second District considered and rejected this contention in Boyt:
The father argues that the creation of such a fund constitutes a prohibited award of post-majority support. We disagree. The benefits of child support paid during the child's minority can extend beyond majority. See Nash v. Mulle, 846 S.W.2d 803 (Tenn.1993).[3] Such would be the case if the custodial parent decided to dedicate a portion of the periodic payments to a trust for the child's post-majority college education or other need. We see no distinction if such a fund is mandated by the court.
Id. (footnote added).
I would align this court with the Second District and approve the concept of a guardian to manage child support funds that exceed a child's present needs, or to oversee funds where there is evidence that the custodial parent has wasted or mismanaged support payments.[4] I would also find that a trust is the appropriate vehicle to accomplish this task. In this case, however, the lower court failed to enter a detailed order explaining how the fund would be enforced and distributed. Although the court clarified under what circumstances the money should be distributed to the child,[5] it failed to detail the guardian's duties with regard to holding the fund. As a result, "the guardian is left holding a fund without any defined authority or duty." Boyt, 664 So.2d at 998. I would therefore vacate that portion of the final judgment and remand the case for the trial court to conduct a hearing to determine if such a plan is still necessary, and if so, to permit the mother to submit a proposed plan. If the mother fails to do so, or if her plan is unacceptable, the trial court may formulate its own plan, as long as it supplies sufficient detail to provide meaningful appellate review. See id.
In conclusion, I believe the trial court acted within its discretion in awarding monthly support below the guidelines and in ordering *350 a portion of the award to be held in a guardianship trust. However, I would reverse and remand for the court to proceed under the dictates of Boyt.
W. SHARP and GRIFFIN, JJ., concur.
GRIFFIN, Judge, dissenting.
I concur in the dissenting opinion of Judge Goshorn. I think he has got this case exactly right, as, in fact, did the trial judge. The lower court's only error was in failing to articulate how the guardian ad litem trust was to be administered.
I confess I do not understand the concern that appears to have gripped the majority, as reflected in its lengthy opinion, or its reading of the Miller v. Schou decision. There is nothing radical about Miller. Florida courts, including this one, have always recognized the principle that Miller simply reiterated. Mason v. Reiter, 564 So.2d 142 (Fla. 3d DCA 1990); Smith v. Smith, 474 So.2d 1212 (Fla. 2d DCA 1985); Wanstall v. Wanstall, 427 So.2d 353 (Fla. 5th DCA 1983). That the support to be paid for a child of divorced parents or unmarried parents should be commensurate with the economic and social circumstances of the parents is well established. Although courts do not involve themselves in decisions concerning how much money to allocate for the support of children in intact families, the reality of divorce and unwed births has foisted this duty on the courts. Some device has to be used, and the one settled upon by the legislature is a system of guidelines based principally on disposable income. As of 1993, the legislature has determined that child support awards for high income individuals will no longer be handled outside the guidelines, but brought within them, meanwhile vesting the trial court with discretion to deviate for good reason, which the judge in this case chose to do. The majority nevertheless concludes that it was reversible error for the lower court to award a penny more than the amount the majority concludes was required for the child's "daytoday living expenses." This apparently was ascertained by examining the spending patterns of a mother the lower court has already clearly found incapable of properly managing money.
Although I agree that child support should not be used to force the payor parent to create an involuntary trust for the child, the law must always be alert to distinctions. The fact is that this case is extraordinary and we should take this fact into account. The lower court was faced with fashioning a support order for the benefit of this child whose father, a star NBA basketball player, has a monthly gross income of $266,926. At least, he has that now. Given the normal career expectancy of such a professional athlete, it is probable that he will be out of the NBA entirely or playing for much reduced sums long before his child reaches her teens. The fact that the income is so high while the duration is so short further supports the scheme fashioned by the lower court.
Perhaps most startling about the majority decision is the determination that the guidelines are "merely a rebuttable presumption of the child's need." If a guidelines child support amount is subject to reversal as a matter of law, as in this case, because the quantum of evidence offered was deemed sufficient to rebut the presumption that the child "needed" a guidelines amount of support, it necessarily follows that any guidelines child support award in Florida would be open to the same attack on the same quantum of evidence. Whether the income on which the support award is based is $200,000 per month, $20,000 per month or $2,000 per month, the principle is the same. The principle appears to be that if the payor of support using such "proof" as was found to be conclusive in this case, can show that the child does not have an "actual day-to-day need" in an amount as great as the guidelines support figure, then, as a matter of law, the lower court must reduce support to the amount of actual "need." The court doesn't even have the discretion, seemingly conferred by section 61.30, to deviate from the guidelines in any amount other than this "actual day-to-day need" amount. This decision could have a dramatic effect on the quantity and nature *351 of child support litigationat least in this district.
GOSHORN, J., concurs.
NOTES
[1] The mother used $4,000 in child support money as a down payment, and she also makes the monthly payments out of proceeds from child support.
[2] At the time the father become involved with her, the mother had already given birth to two children out of wedlock, one daughter, age 8, for which the mother receives $160 per month support and another daughter, age 14, for which she apparently neither receives nor contributes any support.
[3] In Nash, the Tennessee Supreme Court approved of a juvenile court's order requiring a wealthy noncustodial father to pay $3,092.62 per month, of which $1,780.17 would be placed into a trust fund for child's college education. The court found that the action was not an impermissible award of post-minority support, and although the father could not be required to pay post-minority support, benefits of the amount paid during the child's minority could extend beyond her youth. Id. at 806. The court reasoned that "in many cases parents undergo serious financial sacrifices to make college possible for their children, [and here, the father's] income can afford [the child] ... a high standard of living that also includes savings for college." Id. at 807.
[4] The majority presupposes that the monthly amount payable to the guardian is for the purpose of creating an estate for the child. I believe, however, that its purpose is to provide, subject to the trial judge's approval, for unusual or exceptional expenses directly related to the support of the child. In any event, had this cause been remanded as proposed by the original panel, the court's order would have provided the answer and would have enabled us to address the majority's concern if it is correct.
[5] The court directed the father to pay $3,000 per month to the guardian "until the minor child attains the age of eighteen years, dies, marries, joins the military service, comes to permanently reside with the Respondent under an order modifying residential custody, until the death of the Respondent, or until further order of Court."