Argued and submitted March 6, 2000, child support award for son vacated and remanded for entry of findings or modification; otherwise affirmed February 28, 2001

## In the Matter of the Marriage of

### Lisa Lynn MCGINLEY,
nka Lisa Lynn Hamilton-Treick,
*Respondent - Cross-Appellant,*

*and*

### Daniel Case MCGINLEY,
*Appellant - Cross-Respondent.*

(D8712-68732; CA A101792)

19 P3d 954

See also, 156 Or App 449, 965 P2d 486.

Charles F. Hinkle argued the cause for appellant - cross-respondent. With him on the briefs was Stoel Rives LLP.

Mark A. Johnson argued the cause for respondent - cross-appellant. With him on the brief was Findling & Johnson LLP.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

ARMSTRONG, J.

**ARMSTRONG, J.**

Father appeals from a judgment modifying his child support obligation for his son and affirming his support obligation for his daughter, who is a student at a private liberal arts college. Mother cross-appeals from the judgment. She challenges the trial court's refusal to increase father's support obligation for daughter based on a decrease in daughter's financial aid award. On *de novo* review, we affirm in part and reverse in part.

The court entered a judgment in 1988 dissolving the parties marriage. The dissolution judgment awarded custody of the parties' two children to mother and ordered father to pay both child and spousal support. Both parties sought to modify the dissolution judgment in 1996 and again in 1997. In response to the first motion, the trial court terminated spousal support due to changed circumstances, terminated child support for son based on son's incarceration in the state correctional system, and increased father's support obligation for daughter based on her educational expenses as a child attending school, ORS 107.108. In its ruling on the second motion for modification, the trial court refused to increase father's support obligation for daughter because it concluded that no substantial change of economic circumstances had occurred; it reinstated father's support obligation for son as a result of son's transitional release from state boot camp; and it declined to terminate father's support obligation for daughter based on father's contention that ORS 107.108 violates the state and federal constitutions.

Father appeals, assigning error (1) to the trial court's refusal to hold that ORS 107.108 violates the state and federal constitutions and (2) to the amount of child support that the court ordered for son. Father argues that ORS 107.108 violates the Oregon Constitution's Equal Privileges and Immunities Clause, Or Const, Art I, § 20, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. With regard to son's support, father argues that the trial court improperly deviated from

the Uniform Child Support Guidelines without entering findings to support the deviation. ORS 25.280. Mother cross-appeals. She assigns error to the trial court's refusal to increase father's support obligation for daughter based on a decrease in daughter's financial aid award. She alleges that the trial court committed an error of law in not recognizing the decrease as a change in circumstances that was sufficient to justify a modification. ORS 107.135(2)(a) (1997).

We conclude that ORS 107.108 does not violate either the state or federal constitutional guarantee of equal treatment. Additionally, we conclude that the decrease in daughter's financial aid award did not constitute an unanticipated substantial change in economic circumstances. ORS 107.135(2)(a) (1997). Accordingly, we affirm the child support award for daughter. With regard to the support award for son, we agree with father that the trial court improperly deviated from the guidelines without making findings to support its decision to do so. ORS 25.280. We therefore remand that portion of the judgment to the trial court for entry of findings or modification of the award.

■ Before discussing the merits of the case, we first address mother's concern that both father's constitutional challenge to ORS 107.108 and mother's cross-appeal may be moot as a result of father having fulfilled his statutory support obligation to daughter since the court entered its second modification judgment. "A case becomes moot for the purpose of an appeal when, because of a change of circumstances prior to the appellate decision, the decision would resolve merely an abstract question without practical effect." *State ex rel Juv. Dept. v. Holland,* 290 Or 765, 767, 625 P2d 1318 (1981) (citations omitted). Because we have the power to make any modification of father's support obligation for daughter retroactive to the date that father moved to modify the dissolution judgment, our decision could affect father's support obligation for daughter. *See Pedroza and Pedroza,* 128 Or App 102, 107, 875 P2d 478 (1994) ("[M]odification of a support order can be made retroactive to the date of the filing of the motion to modify.") (citations omitted). Consequently, that issue is not moot.

In our analysis of the merits, we turn first to father's state and federal constitutional challenges to ORS 107.108.[1] ORS 107.108(1) provides in relevant part that, in cases of dissolution or separation, "the court may enter an order against either parent, or both of them, to provide for the support or maintenance of a child attending school." The statute defines a "child attending school" as

> "a child of the parties who is unmarried, is 18 years of age or older and under 21 years of age and is a student regularly attending school, community college, college or university, or regularly attending a course of professional or technical training designed to fit the child for gainful employment. A child enrolled in an educational course load of less than one-half that determined by the educational facility to constitute 'full-time' enrollment is not a 'child attending school.' "

ORS 107.108(8). Enacted in 1973, ORS 107.108 reflects Oregon's commitment to make higher education as available as possible to its citizens. Our state's tradition of requiring divorced parents to support their children while they attend college goes back at least to the Supreme Court's 1941 decision in *Jackman v. Short*, 165 Or 626, 638-39, 109 P2d 860 (1941), in which the court held that the trial court properly required a noncustodial father to help pay for his 18-year-old daughter to attend Oregon State College.[2] In so holding, the court emphasized the importance of a college education in our society.[3] Since the court decided *Jackman*, the importance of a college education to success in our society has

---

[1] Mother raises various preservation issues with respect to this assignment of error; we reject them without discussion.

[2] Under the statutes in place in *Jackman*, the age of majority was 21, and courts had no authority to require parents to support their children after they had reached that age. *Jackman*, 165 Or at 638; Or Code 1930, § 6-915. *See also Mack v. Mack*, 91 Or 514, 517, 179 P 557 (1919). Although the age of majority in Oregon is now 18, the situation in *Jackman* differs from that in our case because courts now have express statutory authority to provide for support of children who have reached the age of majority but who are not yet 21. ORS 107.108. Another difference between the two statutory schemes is that the applicable statute in *Jackman* simply allowed courts to order support for the education of children without specifying the level of education, Or Code 1930, § 6-915, whereas Oregon courts are now specifically authorized to order support for post-secondary educational expenses, ORS 107.108.

[3] The court stated that "[o]ne of the principal purposes of an education is still to train the young for the discharge of their duties to society and to afford them such knowledge of our government and American institutions that upon reaching majority they will intelligently perform their part in the great social order."

undoubtedly become greater. *See, e.g.*, Charles F. Willison, *But Daddy, Why Can't I Go to College? The Frightening De-Kline of Support for Children's Post-Secondary Education*, 37 BC L Rev 1099, 1124 (1996); Leslie J. Harris et al., *Making and Breaking Connections Between Parents' Duty to Support and Right to Control Their Children*, 69 Or L Rev 689, 721 (1990). Morever, we specifically recognized the importance of such an education in our recent decision in *Crocker and Crocker*, 157 Or App 651, 660, 971 P2d 469 (1998), *rev allowed* 328 Or 418 (1999), in which we upheld ORS 107.108 and affirmed the legitimacy of the state's interest in having a well-educated populace.

Although father does not dispute the value of higher education, he argues that the state's decision to require divorced parents to support their children in such endeavors, while not imposing a similar burden on married parents living together, violates the state and federal constitutions. Father urges that classifications based on marriage or divorce should be recognized as suspect under both the state and federal constitutions and, therefore, that such classifications should be subject to heightened scrutiny by courts. Alternatively, he argues under the federal Equal Protection Clause that ORS 107.108 interferes with the fundamental right to make decisions about marriage and divorce and, for that reason, that the law should be subject to strict scrutiny. Finally, father contends that, even if we do not apply heightened scrutiny, ORS 107.108 is invalid under both the state and federal constitutions because it is not rationally related to any legitimate governmental purpose. We conclude that the law does not discriminate against a suspect class and therefore that it is not subject to heightened scrutiny on that basis under Article I, section 20, of the Oregon Constitution or the Fourteenth Amendment to the United States Constitution. We also conclude that the law does not significantly interfere with the exercise of a fundamental right and therefore that heightened scrutiny is not warranted under the Fourteenth Amendment. Finally, we conclude that ORS

---

*Jackman*, 165 Or at 639. It also quoted Blackstone's statement that " '[t]he last duty of parents to their children is that of giving them an education suitable to their station in life; a duty pointed out by reason, and of far the greatest importance of any.' " *Id*. (quoting 1 *Blackstone's Commentaries*, *450 (Lewis ed 1898)).

107.108 does not otherwise impermissibly distinguish among people or classes of them. We therefore affirm the trial court's decision rejecting father's challenge to ORS 107.108.

We begin by addressing father's state constitutional challenge to ORS 107.108. Article I, section 20, provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." "[T]he clause 'forbids inequality of privileges or immunities not available upon the same terms, first, to any citizen, and second, to any class of citizens.' "[4] *Tanner v. OHSU*, 157 Or App 502, 520, 971 P2d 435 (1998) (quoting *State v. Clark*, 291 Or 231, 237, 630 P2d 810, *cert den* 454 US 1084, 102 S Ct 640, 70 L Ed 2d 619 (1981)). Article I, section 20, distinguishes between true classes, which are protected in varying ways against discrimination, and pseudo-classes, which are not. Pseudo-classes are those that are created by the challenged law and that have no existence apart from it, whereas true classes are based on "antecedent personal or social characteristics or societal status." *Id.* at 521 (internal quotation marks and citation omitted). Among true classes, cases construing Article I, section 20, have further distinguished between suspect classes and nonsuspect classes and have required a higher level of scrutiny by courts of laws discriminating against suspect classes. *Id.* at 522-23. Although there is not yet any overarching definition of a "suspect class," it has been established that "the focus of suspect class definition is not necessarily the immutability of the common, class-defining characteristics, but instead the fact that such characteristics are historically regarded as defining distinct, socially recognized groups that have been the subject of adverse social or political stereotyping or prejudice." *Id.* at 523.

---

[1] Father argues both that he is a member of a class that is discriminated against in violation of Article I, section 20, and that he also is discriminated against as an individual in violation of that provision. In order to establish the latter, father would have to show that "the government * * * made or applied * * * [ORS 107.108] so as to grant or deny privileges or immunities to * * * [him as an individual] without legitimate reasons related to * * * [his] individual situation." *State v. Clark*, 291 Or 231, 239, 630 P2d 810, *cert den* 454 US 1084, 102 S Ct 640, 70 L Ed 2d 619 (1981). Father has not made any attempt to demonstrate that the law was enacted to target him personally or that it has been applied differently to him than to others. Accordingly, his claim that ORS 107.108 discriminates unlawfully against him as an individual fails.

■ We have already decided that ORS 107.108 discriminates against a true class. That "class comprises people who, like father, are divorced parents of children attending school. They can be identified by their status as divorced parents of such children and not by the challenged law." *Crocker*, 157 Or App at 660. The next question we must answer under Article I, section 20, is one that we expressly left open in *Crocker*: whether that class of parents comprises a suspect class. *Id.*[5] For the reasons that follow, we conclude that it does not.

As a preliminary matter, we note that, although father argues that ORS 107.108 distinguishes between parents solely on the basis of marital status, that is not precisely true. The class of parents who are burdened by the statute[6] includes parents who are currently married (to spouses who are not the biological parents of the children attending school), as well as parents who never remarried after divorcing the parents of the children at issue.[7] Thus, the burdened class includes individuals who are currently married and those who are not. Similarly, the class of parents whom the statute does not reach includes parents who married once and have never divorced, as well as those who were divorced before marrying the parents of the children who now wish to attend school. Thus, to the extent that status as a divorcé or divorcée has in the past caused a person to be the target of pernicious stereotypes, the statute does not distinguish between people on that basis and, therefore, it cannot be argued that the statute is based on those stereotypes. *See, e.g., Califano v. Jobst*, 434 US 47, 55, 98 S Ct 95, 54 L Ed 2d 228 (1977) (discussing statutory classifications in the context of a federal equal protection challenge); *cf. Tanner*, 157 Or

---

[5] The father in *Crocker* did not argue that anything other than rational basis analysis was required to test the validity of ORS 107.108 under Article I, section 20, or the Fourteenth Amendment. Accordingly, we decided the case using a rational basis analysis. *Crocker*, 157 Or App at 660.

[6] As discussed in *Crocker*, courts are also authorized to order parents who never married each other and parents who are married but living apart to support their children while they attend school. *Crocker*, 157 Or App at 656-57. *See also* ORS 109.155; ORS 108.110. The complete statutory scheme therefore distinguishes between parents who are married to and living with the parents of the children who are attending school and those who are not. However, for purposes of our analysis, we will focus on the class created by the challenged statute, ORS 107.108, to determine whether the class that ORS 107.108 burdens is suspect.

[7] Indeed, mother and father in this case have both remarried.

App at 525 (holding that the fact that the class of persons not entitled to insurance benefits for their partners included both homosexual and heterosexual persons did not defeat plaintiffs' Article I, section 20, challenge, because the class of persons receiving such benefits for their partners, by definition, excluded all members of the class challenging the statute). Consequently, there is no need for us to address whether a classification strictly based on marital status would be suspect for purposes of Article I, section 20.

The question remains, however, whether the classification created by ORS 107.108 (*i.e.*, between parents of children attending school who are currently married to each other and parents of children attending school who are not) is a suspect classification. As stated previously, we will consider a classification to be suspect if it is based on "characteristics [that have been] historically regarded as defining distinct, socially recognized groups that have been the subject of adverse social or political stereotyping or prejudice." *Tanner*, 157 Or App at 523. Father argues that ORS 107.108 discriminates against divorced parents and that such parents, particularly fathers, have been the subject of adverse stereotypes and prejudice.

Arguably, divorced parents are part of a distinct, socially recognized group, although the group is not as well recognized as are other socially recognized groups. There are songs and movies and books about divorced parents and organizations of and for them. There also have been several national and statewide campaigns to recover unpaid child support from such people. Thus, although father has not provided evidence of entrenched group status, we will assume for the sake of argument that divorced parents do comprise a socially recognized group.

The next question under Article I, section 20, is whether that group has been the subject of "adverse social or political stereotyping or prejudice." *Tanner*, 157 Or App at 523. Although the issue is not beyond dispute, we conclude that divorced parents have not been the subject of stereotyping or prejudice to an extent that would render them a suspect class. Gender, race, religious affiliation, alienage, and sexual orientation are among the classifications identified as

suspect for purposes of Article I, section 20. *Id.* at 524. It is almost universally understood that members of all of those groups have been routinely targeted for adverse treatment over the years in our society. To cite but a few examples, both African-Americans and women did not obtain federally guaranteed voting rights until relatively late in our country's history. *See* US Const, Amends XV and XIX. Racial discrimination in public accommodation was prevalent well into the 1960s. *See, e.g., Heart of Atlanta Motel, Inc. v. United States,* 379 US 241, 85 S Ct 348, 13 L Ed 2d 258 (1964). Homosexual sexual practices have historically been, and in some states continue to be, outlawed. *See, e.g., Bowers v. Hardwick,* 478 US 186, 106 S Ct 2841, 92 L Ed 2d 140 (1986). Aliens and members of unpopular religious groups have been frequent victims of discriminatory laws and have been routinely subject to social ostracism. *See, e.g., Graham v. Richardson,* 403 US 365, 91 S Ct 1848, 29 L Ed 2d 534 (1971); *Church of Lukumi Babalu Aye, Inc., v. Hialeah,* 508 US 520, 113 S Ct 2217, 124 L Ed 2d 472 (1993). It is not apparent that divorced parents face anything similar to the social and political obstacles that members of the groups identified above face, and father has not provided us with evidence to the contrary. Although father argues that ORS 107.108 is based on the stereotype that divorced parents have less interest in paying for their children's college education than do married cohabiting parents[8] we do not find that generalization, standing alone, to be significant enough to justify the recognition of the group as a suspect class. Accordingly, we conclude that the distinction among classes that is embodied in ORS 107.108 is not subject to heightened scrutiny under Article I, section 20.

Under Article I, section 20, when the challenged classification does not involve a suspect class, we have applied a rational basis test to evaluate whether the classification violates the provision. We will assume that that is the relevant test for us to apply here. *Sherwood School Dist. 88J v. Washington Cty. Ed.,* 167 Or App 372, 386, 6 P3d 518, *rev den* 331 Or 361 (2000).[9]

---

[8] We accept father's assertion that the law is based on that generalization for the purposes of argument only.

[9] *Cf.* Hon. Rex Armstrong, Ruth M. Spetter and Wendie L. Kellington, *Constitutional Limitations and Exactions,* in Oregon State Bar CLE, *Land Use* Ch 14 at

To satisfy that test, "the classification involved must bear some rational relationship to [a] legitimate end." *Withers v. State*, 163 Or App 298, 309, 987 P2d 1247 (1999), *rev den* 331 Or 284, 987 P2d 1247 (2000). Although we have already decided that ORS 107.108 satisfies Article I, section 20's rational basis test, *Crocker*, 157 Or App at 663, father urges us to overrule *Crocker* in light of a Pennsylvania Supreme Court case that held, under a similar state statute, that there was no rational basis for the legislature's decision to give children with divorced parents an advantage over those with intact families in paying for their college education. *Curtis v. Kline*, 542 Pa 249, 666 A2d 265 (1995). We decline to do so.

We have identified the interest served by ORS 107.108 as the state's interest in having a well-educated populace. *Crocker*, 157 Or App at 660. The legitimacy of that interest is undisputed. *See* Willison, 37 BC L Rev at 1123. Moreover, as we indicated in *Crocker*, it is rational to believe that children from nonintact families will have more difficulty paying for their college education than will children from intact families, in part because of lack of support from divorced parents:

> "[L]egislators could rationally believe that, because of the nature of divorce and separation, there will be instances in which children will not receive support from their parents to attend school precisely because the parents are divorced or separated, despite the fact that the parents have the resources to provide the support and it is in the children's best interest for them to do so. * * * Providing courts with the authority to require those parents to support their children attending school is a rational response to that problem."

*Crocker*, 157 Or App at 661.[10] Indeed, the economic disadvantages suffered by children of divorced parents are well documented. *See* Willison, 37 BC L Rev at 1115-20. ORS 107.108

---

14-12 (2000 Supp) (suggests possible refinement of rational basis test under Article I, section 20, in light of the purpose of the provision).

[10] Although, as father argues, there undoubtedly are divorced parents who are willing to contribute to their children's education and married parents of equivalent economic circumstances who are not, that fact does not make the classification irrational. *Crocker*, 157 Or App at 662 ("A statute does not have to be perfect in order for it to be rational.").

reflects the legislature's effort to ameliorate that disadvantage, and nothing in the Pennsylvania Supreme Court's decision in *Kline* convinces us that that effort is irrational.

In particular, we note, as we did in *Crocker*, that the legislative distinction embodied in ORS 107.108 mirrors the distinction in ORS 107.105(1)(c), which allows courts to order divorced parents to pay child support for minor children but which contains no similar provision with respect to married parents who are living together. *Crocker*, 157 Or App at 662.[11] Although Oregon law draws a distinction between support for children under 18 years of age and support for those 18 to 21 years of age, the distinction presumably reflects a difference in the importance of that support to the two groups. In that light, we believe that the legislature could have reasoned as follows in deciding to authorize courts to require divorced parents to support their children attending school and, if it had, that its decision would be rational: Children under 18 years of age are likely to be attending high school and to have less ability than do older people to earn an income sufficient for their needs. Because of the importance attached to a high school education and the inability of younger children to provide for themselves, the state has chosen to impose on all parents, whether married or not, the obligation to support their children under 18 years of age. ORS 109.010; ORS 109.510.[12] In contrast, the legislature could have believed that children between 18 and 21 have a greater ability to earn an income sufficient to meet their needs and that it is less critical to them and to society that they receive a post-secondary education in addition to a high school education. Because the consequences of failing to provide support for 18- to 21-year-old children may be less significant than they are for children under 18 years of age, the state has not chosen to impose an obligation on all parents to provide support for their 18- to 21-year-old children.

---

[11] *But cf.* ORS 419B.400 (authorizes juvenile court that has assumed jurisdiction of a child to order parents to provide support for child, including a child attending school).

[12] *But cf.* ORS 109.520; ORS 419B.552(1)(b) (support obligation terminates for children under 18 years of age who marry or are emancipated).

However, the legislature reasonably could believe that divorced parents are likely to have greater difficulty than are married parents in making joint decisions about financial support for their 18- to 21-year-old children. As a consequence, there is a greater likelihood that children of divorced parents will receive less support for post-secondary education than will children of married parents. ORS 107.108 addresses that difference by providing a mechanism by which the state will intercede on behalf of the children of divorced parents to obtain support for them to attend school. ORS 107.105(1)(c) provides the same assistance to children who are under 18 years of age whose parents are divorced by interjecting the state into decisions about financial support for them while not interjecting the state into those decisions for children whose parents are married.

■ If, as father contends, it violates Article I, section 20, to treat divorced parents differently from married parents with regard to the obligation to support their 18- to 21-year-old children who are attending school, then it violates that provision to treat parents differently with regard to support for their children under 18 years of age. As far as we know, every state in the country distinguishes between divorced parents and married parents with regard to state involvement in decisions about the financial support of their children under the age of majority. It would be remarkable for us to conclude that the constitutional guarantee of equal treatment that is found in some form in most, if not all, state constitutions and in the federal constitution, is violated by such a difference in treatment. *See generally* Willison, 37 BC L Rev at 1114-15. We conclude that the distinction embodied in ORS 107.108 does not violate Article I, section 20, of the Oregon Constitution.

We turn now to father's contention that ORS 107.108 violates the Fourteenth Amendment's Equal Protection Clause because it impermissibly classifies parents according to marital status and because it infringes on the fundamental right to marry. We reject both contentions.

■ Section 1 of the Fourteenth Amendment provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Under that clause,

challenged laws will be subject to rational basis review unless they discriminate against a suspect class or infringe on a fundamental right. *See, e.g., Massachusetts Bd. of Retirement v. Murgia*, 427 US 307, 312 , 96 S Ct 2562, 49 L Ed 2d 520 (1976). Father argues that classification according to marital status should be recognized as suspect and that ORS 107.108 should therefore be subjected to heightened scrutiny.

■    First of all, we note that the Supreme Court has previously suggested that distinctions based on marital status are not suspect.[13] Moreover, as we indicated above, ORS 107.108 does not strictly classify according to marital status, because both the burdened group and the benefitted group under ORS 107.108 contain currently married and previously divorced persons. Under the interpretation of discrimination adopted by the Supreme Court, the fact that the benefitted group includes members of the class allegedly discriminated against precludes a holding that the law discriminates against that class. *See Geduldig v. Aiello*, 417 US 484, 496 n 20, 94 S Ct 2485, 41 L Ed 2d 256 (1974) (holding that discrimination based on pregnancy is not gender discrimination for the purposes of the Equal Protection Clause because some "non-pregnant" women are members of the benefitted class).[14] Having concluded that distinctions between married and unmarried people have not yet been recognized as suspect and that ORS 107.108 does not discriminate on that basis, we turn to whether the narrower class that ORS 107.108 burdens should be recognized as suspect.

■    As we noted earlier, the distinction that ORS 107.108 actually draws is between divorced parents whose children wish to attend college and parents who are married to the

---

[13] *See Jobst*, 434 US at 53 ("Differences in race, religion, or political affiliation could not rationally justify a difference in eligibility for social security benefits, for such differences are totally irrelevant to the question whether one person is economically dependent on another. But a distinction between married persons and unmarried persons is of a different character.").

[14] Because father has not produced any direct evidence that the legislature was motivated by animus against men in enacting ORS 107.108 and because the burdened and benefitted classes under ORS 107.108 contain both men and women, the Supreme Court's analysis in *Aiello* also forecloses father's suggestion that ORS 107.108 discriminates based on gender. *Aiello*, 417 US at 496 n 20.

parents of the children who wish to attend college. The Supreme Court has defined a "suspect class" as "one saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Murgia*, 427 US at 313 (internal quotation marks and citation omitted). Based on that definition, we conclude that divorced parents of children attending school should not be recognized as a suspect class for purposes of the Equal Protection Clause. Many of the same reasons that supported our decision under Article I, section 20, are applicable here. No showing has been made that divorced parents of children attending school have historically been subject to discriminatory laws or that they have been shut out of the political process. Unlike the situations with respect to race, gender, and alienage, we know of no history of places of public accommodation refusing to serve divorced parents, nor have we been made aware of cases of employment discrimination against that class. To the extent that father is attempting to use the challenged law itself as evidence of a history of purposeful discrimination, his position is unavailing. We are not aware of any equal protection case in which a court has held that the history of purposeful discrimination necessary to support recognition of a suspect class may consist of the challenged law itself; we believe that that history must contain evidence apart from the challenged law, especially when there is no evidence that the law is based on pernicious stereotypes.

We conclude that divorced parents of children attending school are not a suspect class for purposes of the Equal Protection Clause and that ORS 107.108 should not, therefore, be subject to heightened scrutiny on the basis that it discriminates against a suspect class. We turn to father's contention that ORS 107.108 interferes with a fundamental right and should be subjected to strict scrutiny on that basis.

■ Father argues that ORS 107.108 interferes with the fundamental right to marry. Because it is well established that the right to marry is fundamental, the remaining question is whether ORS 107.108 "significantly interferes with the exercise of that right." *Zablocki v. Redhail*, 434 US 374, 383, 98 S Ct 673, 54 L Ed 2d 618 (1978). If it does, it is subject

to strict scrutiny. *See id.* at 388. However, for the reasons that follow, we conclude that the statute does not significantly interfere with the right to marry.

In *Zablocki*, the Supreme Court addressed a Wisconsin statute that required noncustodial parents with outstanding child support obligations to obtain a court order before remarrying. Under the statute, the court order would be granted only if the parent submitted proof of compliance with the child support obligations and showed that the child was not currently a public charge or likely to become one in the future. Because the parent in *Zablocki* was indigent and, therefore, was unable to meet his support obligations, he was unable to marry under Wisconsin law. In holding that the statute significantly interfered with the right to marry, the Court noted that it prevented some members of the affected class from marrying at all, that it burdened others to such an extent that they would be "in effect * * * coerced into forgoing their right to marry," and that even those who met the statutory requirements would "suffer a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental." *Id.* at 387. However, in holding the statute unconstitutional, the Court emphasized that "reasonable regulations that do not significantly interfere with the marital relationship may be legitimately imposed." *Id.* at 386 (citation omitted).

Federal appeals courts have built on the analysis in *Zablocki* to further delimit the constitutionally permissible level of state interference with the right to marry. In *P.O.P.S. v. Gardner*, 998 F2d 764 (9th Cir 1993), the Ninth Circuit upheld Washington's child support guidelines against equal protection and due process challenges. The organization challenging the guidelines argued that they resulted in such high awards of child support that noncustodial parents were effectively precluded from remarrying. In rejecting that argument, the court stated that, unlike the statute in *Zablocki*, the guidelines did not directly interfere with the marital relationship because they did not bar anyone from getting married. It also noted that courts had authority to deviate from the guidelines in the event that a child support obligation was so high that it effectively prevented a noncustodial parent from remarrying. Finally, the court noted that the

"burden of child support awards may very well discourage some people from having additional children and may discourage some from entering new marriages. But all financial obligations impact family decisions. Providing financial and emotional support is the responsibility one assumes by choosing to have children. Every obligation imposed by the State cannot be subject to strict scrutiny."

*P.O.P.S.*, 998 F2d at 768-69.

Similarly, in *Wright v. MetroHealth Medical Ctr*, 58 F3d 1130 (6th Cir 1995), the Sixth Circuit upheld a hospital's anti-nepotism policy against the plaintiffs' allegation that it interfered with their right to marry. The policy provided for the transfer of one spouse in the event that both became employed in the same location. The court suggested that, although anti-nepotism policies may place economic burdens on the decision to marry, they do not directly interfere with that decision. It further noted that the policy at issue did "not create a legal obstacle that would prevent a class of people from marrying," and that it therefore did "not directly and substantially interfere with the fundamental right to marry." *Id*. at 1135-36. Accordingly, it subjected the policy to a rational basis analysis.

We conclude that the burden imposed by ORS 107.108 does not substantially interfere with the fundamental right to marry.[15] The law allows courts to impose an economic burden on divorced parents when their adult children wish to attend college. Although father argues that the law rewards those who decide to stay married to the parents of their children and that it therefore, in effect, interferes with the decision to divorce, the burden that he describes is indirect and attenuated, rather than direct and substantial as was the burden in *Zablocki*. Unlike the statute in *Zablocki*, nothing in ORS 107.108 conditions the right to divorce on a parent's ability or willingness to assist his or her child in obtaining a post-secondary education. Instead, ORS 107.108 operates similarly to the child support guidelines in *P.O.P.S.*

---

[15] We assume for purposes of argument that the right to divorce is part of, and entitled to the same degree of protection as, the right to marry. *See, e.g., Boddie v. Connecticut*, 401 US 371, 376, 91 S Ct 780, 28 L Ed 2d 113 (1971) (implying that the right to divorce is part of the fundamental right to marry).

and the anti-nepotism policy in *Wright*. It economically burdens the decision to divorce in an indirect way. Indeed, the burden often is imposed, as in this case, *after* the divorce has become final. Moreover, because the parent's support obligation under ORS 107.108 is necessarily tied to the parent's income and ability to pay, it cannot be said that the obligations imposed by ORS 107.108 are so prohibitive that they could effectively bar indigent individuals from divorcing. Because we conclude that ORS 107.108 does not discriminate against a suspect class or directly and substantially interfere with the exercise of a fundamental right, we hold that it is subject to rational basis analysis only.

■ Rational basis analysis under the Equal Protection Clause is similar to the equivalent analysis under Article I, section 20. As we stated above, the state has a legitimate interest in having an educated populace, and requiring divorced parents to contribute to their children's education is a rational means of furthering that interest. Father does not dispute the legitimacy of the state's interest in education; instead he argues that the statutory distinction between divorced parents and parents who remain married to one another is irrational. It is simply too late in the day to make that argument under the Equal Protection Clause. As the United States Supreme Court said nearly 30 years ago:

> "Particularly with respect to social welfare programs, so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point. '[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all.' *Dandridge v. Williams*, 397 U.S. 471, 486-487[, 90 S Ct 1153, 25 L Ed 2d 491] (1970)."

*Aiello*, 417 US at 495. ORS 107.108 is one means of providing for the welfare of Oregon's younger citizens. The legislature is entitled to significant latitude in attempting to reach that goal. Its decision to assist children of divorced parents, who are likely to be more economically vulnerable than are other children, is not irrational.

In summary, we conclude that ORS 107.108 violates neither the state nor federal constitutional guarantee of

equal treatment. We therefore affirm the trial court's conclusion on that point.

■    We turn briefly to father's second assignment of error. He argues that the trial court improperly deviated from the guidelines in setting the amount of child support for son without entering findings to support its decision to do so. ORS 25.280. The trial court's judgment provided that child support for son would be determined according to the guidelines, except that the award would not take into account the amount that father was paying for daughter. The guidelines contemplate that a parent's total support obligation for all joint children will be determined in one calculation, according to the parent's income. *See, e.g.,* OAR 137-050-0490 (1997). Where, as here, the support obligation for one joint child is calculated separately, and then the parent is not given any credit for having fulfilled that obligation when the amount of the second child's support is calculated, the support amount will be affected in two different ways. First, the parent's income will be artificially inflated by the court's failure to deduct the amount being paid for the first child. *See* OAR 137-050-0400 (1997) (providing for income deductions for support obligations for nonjoint children).[16] Second, because the guidelines provide that an only child will receive a higher proportion of his or her parent's income than will a child who is part of a larger family, *see* OAR 137-050-0490, Table 1 (1997), separate calculation of the support awards for each child will result in the parent's paying a larger amount for each child.

Although the trial court may have had legitimate reasons to deviate from the guidelines, it had to enter findings to justify its decision to do so. *See* ORS 25.280 (creating a rebuttable presumption that the support amount determined under the guidelines is the correct amount and providing that "a written finding or a specific finding on the record

---

[16] Although both children are joint children in this case, *see* OAR 137-050-0320(1) (1997), one way to implement the court's decision to deviate from the guidelines in order to cover more of daughter's educational expenses would be to treat daughter as a nonjoint child for purposes of calculating son's award. However, a decision to consider a joint child as a nonjoint child would itself be a deviation from the guidelines that would require findings to support it.

that the application of the formula would be unjust or inappropriate in a particular case" will be sufficient to rebut the presumption); OAR 137-050-0330(2)(a) (1997) (reiterating the requirement of findings to rebut the presumption). Accordingly, we vacate the child support award for son and remand it to the trial court for entry of findings or modification according to the guidelines.

■ Finally, we address mother's cross-appeal. She assigns error to the trial court's failure to increase father's support obligation for daughter based on the decrease in her college financial aid award. She argues that the decrease constituted a substantial change in her economic circumstances. See ORS 107.135(2)(a) (1997).[17] "In order to obtain a modification of [a] child * * * support order[ ], [the party requesting modification] must demonstrate a substantial change in circumstances. In addition to being substantial, that change in circumstances must be one that could not have been anticipated at the time of the judgment." Boyd and Boyd, 152 Or App 785, 788, 954 P2d 1281 (1998) (citation omitted). Father argues that mother and daughter were notified before the entry of the judgment in the first modification proceeding that daughter's financial aid award had been decreased and, therefore, that the decrease did not occur within the relevant time period and does not entitle mother to modification. Mother counters that daughter's financial aid package did not become final until after trial and that the trial date, rather than the date of entry of the judgment, is the relevant date for determining whether the change occurred after the first proceeding. There is authority for mother's argument. See, e.g., Sills and Sills, 63 Or App 157, 160, 662 P2d 795, rev den 295 Or 446 (1983). However, in this case, daughter testified in the first modification proceeding that she believed that she would receive less financial aid that year and that she understood that an increase in father's support obligation would cause a decrease in her financial aid award, and the trial court discussed the possibility of a decreased financial

---

[17] ORS 107.135(2)(a) (1997) provides that "[a] substantial change in economic circumstances of a party, which may include, but is not limited to, a substantial change in the cost of reasonable and necessary expenses to either party, is sufficient for the court to reconsider its order of support."

aid award on the record. Based on those facts, we cannot conclude that the award reduction was unanticipated. Accordingly, we affirm the amount of the support ordered for daughter.

Child support award for son vacated and remanded for entry of findings or modification; otherwise affirmed.